No. 2022-1599

# United States Court of Appeals for the Federal Circuit

ALEXSAM, INC.,

*Plaintiff-Appellant*

v.

CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, AND CIGNA HEALTHCARE OF TEXAS, INC.,

*Defendants-Appellee.*

**Appeal From The United States District Court**
**For The Eastern District of Texas In**
**Case No. 2:20-cv-00081-RWS-RDP,**
**Honorable Robert W. Schroeder III**

## ALEXSAM, INC.'S CORRECTED OPENING BRIEF

Jacqueline K. Burt
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Ste. 4320
Atlanta, Georgia 30339
Email: jburt@hgdlawfirm.com
Telephone: (404) 996-0861
Steven W. Ritcheson
INSIGHT PLC
578 Washington Blvd., #503
Marina del Rey, California 90292
Email: swritcheson@insightplc.com
Telephone: (818) 744-8714

Timothy C. Davis
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Email: tim@hgdlawfirm.com
Telephone: (205) 326-3336
W. Lee Gresham, III
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Email: lee@hgdlawfirm.com
Telephone: (205) 326-3336

*Attorneys for Plaintiff-Appellant, AlexSam, Inc.*
October 31, 2022

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant, Alexsam, Inc., certifies the following:

1. The full name of every party or amicus represented by me is:

   Alexsam, Inc. (Plaintiff-Appellant)

2. The name of the real party in interest represented by me is: None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me is: None.

4. The names of all law firms and the partners or associates that appeared for Alexsam, Inc. in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   Travis Lynch
   Jonathan R. Miller
   William Cornelius

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i
TABLE OF AUTHORITIES ........................................................................ iv

**STATEMENT OF RELATED CASES ........................................................ 1**

**STATEMENT OF JURISDICTION ........................................................ 1**

**STATEMENT OF THE ISSUES ........................................................ 2**

**STATEMENT OF THE CASE ........................................................ 2**

A. FACTUAL BACKGROUND ........................................................ 2

1. **The Patentee Explained His Use Of "Unmodified" In The Initial Prosecution Of The '608 Patent.** ........................................ 6

2. **Previous District Court Constructions Of "Unmodified."** .......... 10

3. **The Opinion In *AlexSam v. IDT*.** ........................................ 12

B. RELEVANT PROCEDURAL HISTORY ........................................ 12

**SUMMARY OF ARGUMENT ........................................................ 20**

**STANDARD OF REVIEW ........................................................ 21**

**ARGUMENT ........................................................ 23**

**I. THE DISTRICT COURT FAILED TO PROPERLY CONSTRUE "UNMODIFIED" ........................................................ 24**

A. **THE DISTRICT COURT FAILED TO APPLY CURRENT FEDERAL CIRCUIT AUTHORITY IN CONSTRUING "UNMODIFIED".** ........................ 27

1. **While the *Datastream* construction of "unmodified" was not wrong, the *Datastream* Court's reasoning was later abrogated, and the District Court's reliance on it below was in error.** ......... 27

2. **Properly construed, "unmodified" refers to the claimed functions, not to "any" modification.** ........................................ 32

3. **The *IDT* Court Did Not Rule On The Meaning Or Accuracy Of The Stipulated Claim Construction; The Court Did Find Certain Evidence Insufficient Alone.** ........................................ 35

**B. THE COURT ERRED BY ADOPTING A CLAIM CONSTRUCTION DURING SUMMARY JUDGMENT WITHOUT PRIOR NOTICE.** ....................37

**II. THE DISTRICT COURT FAILED TO PROPERLY EVALUATE THE EVIDENCE PROFFERED BY ALEXSAM AND ITS EXPERTS.** ........................................................................................39

**A. THE DISTRICT COURT MISAPPLIED THIS COURT'S HOLDING IN *IDT*.** 39

**B. ALEXSAM'S EVIDENCE WAS SUFFICIENT TO PROCEED TO TRIAL.** .....42

**1. The Legal Framework.** ..................................................................42

**2. Appellant produced evidence that the POS devices were unmodified based on actual data flow from the POS.** .................44

**CONCLUSION** ...........................................................................................**50**

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*AlexSam, Inc. v. IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013)....................................16

*Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327 (Fed. Cir. 2019)....................................23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................. 23, 43, 50

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (*en banc*).........40

*Digital Ally, Inc. v. Taser International, Inc.*, 810 Fed. Appx. 873 (Fed. Cir. 2020)........................................................................................................40

*Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294 (5th Cir. 2017)....................................21

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304 (Fed. Cir. 2014)............37

*Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-CV-33-JRG-RSP, 2016 U.S. Dist. LEXIS 37946 (E.D. Tex. Jan. 6, 2016)...............................43

*Graham v. John Deere Co.*, 383 U.S. 1 (1966)........................................................6

*Kinetic Concepts, Inc. v. Blue Sky Medical Group*, 554 F. 3d 1010 (Fed. Cir. 2009)........................................................................................................33

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996)...................................................... 6, 21, 26

*Merrill v. Yeomans*, 94 U.S. 568 (1876)..................................................................32

*Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003).......................50

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351 (Fed. Cir. 2008)..................................................................................................26

*Patel v. Tex. Tech Univ.*, 941 F.3d 743 (5th Cir. 2019)...........................................21

*Personalized Media Communic's, LLC v. Apple Inc.*, 952 F.3d 1336 (Fed. Cir. 2020)........................................................................................ 22, 33, 48

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)................. passim

*Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308 (Fed. Cir. 2010)..................................................................................................38

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .........................23

*Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326 (Fed. Cir. 2022)........48

*SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373 (Fed. Cir. 2021).................. 21, 48

*Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973 (Fed. Cir. 2014) ......................47

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 135 S.Ct. 831 (2015).........21

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002)..... 29, 30

*Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362 (Fed. Cir. 2012).........................................................................................22

*Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253 (5th Cir. 2005) ............................23

*Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353 (Fed. Cir. 2016) .....................21

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671 (Fed. Cir. 2015) ..43

*World Class Technology Corp. v. Ormco Corp.*, 769 F.3d 1120 (Fed. Cir. 2014)..........................................................................................22

**Rules**

Fed. R. Civ. P. 56(a)..........................................................................................23

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant provides as follows:

(a) There have been no previous appeals in this case.

(b) Seven (7) district court case(s) may be affected by the Court's decision in this case:

- *AlexSam, Inc. v. Mastercard International Inc.,* Case No. 1:15-cv-02799 (Eastern District of New York);

- *AlexSam, Inc. v. Aetna, Inc.,* Case No. 3:19-cv-01025 (District of Connecticut);

- *AlexSam, Inc. v. Simon Property Group, et al.*, Case No. 2:19-cv-00331 (Eastern District of Texas);

- *AlexSam, Inc. v. Cigna Corporation et al.*, Case No. 2:20-cv-0081 (Eastern District of Texas);

- *AlexSam, Inc. v. U.S. Bank, Inc.,* Case No. 1:21-cv-00588 (Southern District of Ohio);

- *AlexSam, Inc. v. American Express Travel Related Services Company, Inc.,* Case No. 1:21-cv-08116 (Southern District of New York); and

- *AlexSam, Inc. v. HealthEquity, Inc., et al.,* Case No. 2:19-cv-00445 (District of Utah).

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1295(a), as this is an appeal from the final decision of The United States District Court for the Eastern District of Texas in a civil action in which Appellant asserted a claim of

patent infringement against Appellees, who also asserted counterclaims relating to Appellant's asserted patent.

## STATEMENT OF THE ISSUES

- Whether the District Court erred by failing to apply Federal Circuit law and to consider intrinsic evidence when construing claim terms.
- Whether the District Court erred by adopting an understanding of a claim construction that differs from the understanding of at least one of the parties stipulating to a claim construction without prior notice and without a fair opportunity to modify its infringement case to account for the new, or clarified, construction.
- Whether the District Court erred by failing to give weight to Appellant's evidence of infringement through its expert, who relied on actual, undisputed evidence and opined that the accused system practiced the claimed invention.

## STATEMENT OF THE CASE

### A. FACTUAL BACKGROUND

Appellant, AlexSam, Inc. (hereinafter, "AlexSam" or "Appellant"), owns two patents: United States Patent No. 6,000,608 entitled "Multifunction Card System" ("the '608 Patent") and No. 6,189,787 entitled "Multifunctional Card System" ("the

’787 Patent”).[1] Only the ‘608 Patent is at issue in this appeal. See generally Appx0007-0021 (‘608 Patent). The ‘608 Patent has been the subject of prior district court proceedings, including claim construction, and in proceedings before this Court.

At issue in this case is independent claim 32 and dependent claim 33 (the “Asserted Claims”) of the ‘608 Patent, which are reproduced below:

> 32. A multifunction card system comprising:
>
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

[1] The technology at issue in this case can be understood in a general way as follows. The claimed card system is used to transmit ***nonstandard card transactions*** using a standard “bank identification number” to direct transactions to a card processor’s “processing hub” through intermediary devices (such as a “transaction processor”) over a general “banking network.” Notably, the processor’s “hub” also can access databases that include medical account information and financial information.

> 33. The multifunction card system of claim 32, wherein the unique identification number further comprises a medical identification number.

Of particular importance to this Appeal is the term used in paragraph (b), "unmodified existing standard point-of-sale device, … ." The District Court in this case initially construed the phrase as meaning:

> A terminal[,] for making purchases[,] that is of the type in use as of July 10, 1997[, and] that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware ***for use in the card system***.

Appx0022-0081, Claim Construction Order (Dkt. No. 71) at p. 59 (Appx0080) (***emphasis*** added). This construction (with the exception of the bracketed terms and punctuation) has been used by AlexSam in litigation and business negotiations regularly since 2005, when it was first adopted.

Nevertheless, in this case, the Magistrate Judge changed this construction during his consideration of the motion for summary judgment brought by defendants Cigna Corporation, Cigna Health And Life Insurance Company, Connecticut General Life Insurance Company, and Cigna Healthcare Of Texas, Inc. (collectively, "Cigna" or "Appellee") such that the terminal phrase "for use in the card system" was effectively omitted. See Appx0101-0114, Report & Recommendation ("R&R") (Dkt. No. 218) ("…Alexsam needed to prove whether any POS [point-of-sale] terminal used in the accused system was ***modified, at all, with respect to its***

***hardware or software (i.e., without modification), not whether the terminals used in the accused system were solely modified for the purpose of being used in the accused system*.**" Id. at Appx0110) (***emphases*** added). The Magistrate Judge's new construction: (i) contradicted the findings and conclusions reached in nine (9) other cases, including the seminal *Datastream* case, which all included "for use in the card system" as a limitation on "unmodified";[2] (ii) erased an element of the construction that had been stipulated to by the parties and agreed to by the Court; and (iii) is, in the opinion of both Appellant and Appellee, inaccurate.[3]

To resolve this dispute, we must understand the meaning of the phrase that was intended by the patentee, which is revealed in the intrinsic evidence, including the prosecution history and the specification of the '608 Patent. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). In sum, (i) the term "unmodified" was added to Claim 32 (and the other claims of the '608 Patent) by the patentee in a limited way to overcome a prior art reference identified by the examiner during examination as is described below, and (ii) the Specification clearly discloses that

---

[2] See *AlexSam, Inc. v. Datastream*, Case No. 2:03-cv-337 (EDTX); *AlexSam, Inc. v. Humana*, Case No. 2:07-cv-288 (EDTX); *AlexSam, Inc. v. IDT*, Case No. 2:07-cv-420 (EDTX); *AlexSam, Inc. v. UnitedHealth*, Case No. 2:07-cv-512 (EDTX); *AlexSam, Inc. v. Pier 1*, Case No. 2:08-cv-15 (EDTX); *AlexSam, Inc. v. Best Buy*, Case No. 2:10-cv-93 (EDTX); *AlexSam, Inc. v. Green Dot*, Case No. 2:15-cv-5742 (CDCA); *AlexSam, Inc. v. Mastercard*, Case No. 1:15-02799 (EDNY) and *AlexSam, Inc. v. Simon/Blackhawk*, Case No. 2:19-cv-331 (EDTX).

[3] See Appx0429-0476 (2/10/2022 Hrg. Tr.) at p. 90, ll. 4-11 (Appx0452).

the patentee intended that some "modification" of the POS would take place during operation of his claimed system.

### 1. The Patentee Explained His Use Of "Unmodified" In The Initial Prosecution Of The '608 Patent.

Under Federal Circuit law today, the value of the prosecution history is well-known and broadly applied by district courts.[4] See, e.g., *Phillips*, 415 F.3d at 1317 ("In addition to consulting the specification, we have held that a court 'should also consider the patent's prosecution history, if it is in evidence.'") (citing and quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996); see also *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("[A]n invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office.").

In this case, the prosecution of the application that led to the '608 Patent began with the filing of a nonprovisional application on July 10, 1997 (Application Number 08/891,261 or the "'261 Application"). See Appx1102-1301. The initial prosecution ended with the issuance of the '608 Patent on December 14, 1999. See Appx0007-0021. The file recording the correspondence between the U.S. Patent & Trademark

---

[4] A recent search revealed that *Phillips* has been cited 5,560 times in other decisions and opinions. The underlying case is not one of those; neither the Magistrate Judge nor the District Judge analyzed *Phillips* in either the R&R or the MSJ Order. This despite the fact that a *Phillips*-analysis was requested by Appellant. See Appx0429-0476 (2/10/22 Hrg. Tr.) at p. 26, ll. 17-25.

Office ("PTO") and the applicant is referred to herein as the "Prosecution History." Comments made during the initial prosecution proceedings bear directly on the meaning of "unmodified" as used by the patentee.

During the initial prosecution, the Asserted Claims 32 and 33 (as well as other claims of the '261 Application) were rejected based on a reference known as "*Stimson*" (the "Amendment"). See generally Appx1102-1301. The term "unmodified" was added to distinguish the '608 Patent claims from *Stimson*. See id. Specifically, on June 24, 1999 (the "Amendment"), the applicant amended the claims to include the term "unmodified" and provided relevant arguments and comments. See Appx1143-1165. For example, the Amendment at pages 10-11 reads as follows:

> The Examiner and the undersigned have reached agreement, for which the undersigned thanks the Examiner, that ***the claims herein amended distinguish over Stimson since Stimson fails to teach the incorporation of an ABA approved bank identification number as part of the card identification number of a card to be activated***, nor does it teach the activation or use of a phone card (***or any of the single or multi-function cards as described and claimed) that contains an ABA approved bank identification number through a banking network***, which banking network necessarily, by virtue of its being a banking network, incorporates and utilizes a bank processing hub.

Appx1152-1153 (***emphases*** added).

The applicant argued, in effect, that the manner in which *Stimson* transmitted card data was "modified" from the conventional use of a bank identification number (or "BIN") over a "banking network." See also, Appx1153, Amendment at p. 11 ("As discussed [with the Examiner] and agreed, the Stimson system cannot function in an existing banking network, since Stimson lacks the critical feature of the bank identification number on the card which permits access to the banking network.").

The applicant then described the claimed invention in ways that highlight the meaning to be applied to the claimed POS devices operating over the existing banking network:

> Among the novel features that distinguish the present invention over the prior art is the fact that ***the present invention is specifically intended to be deployed over an existing banking network which***, as is recognized by those of skill in the art, ***requires that cards deployed in such a system have associated with them an identifying number which include at least in part a bank identification number***. Bank identification numbers are assigned by the American Banking Association (ABA) ***for use in industry standard banking transactions over existing banking networks*** such as those utilized in the processing of credit card (e.g. Visa, MasterCard, American Express), and debit cards issued by banks. ***By utilizing the ubiquitous existing banking network, custom software is not necessary at the activating location where the card is either activated or utilized to gain information. Thus, existing point-of-sale devices known in the art for processing credit card and/or debit card transactions can be utilized without modification.***

Appx1153, Amendment at p. 11 (***emphases*** added).

Importantly, the patentee describes the very type of "custom programming" that was avoided by use of *unmodified* existing standard POS devices in the claims of the '608 Patent. According to the patentee, advantages of the claimed system over the prior art included that:

> … [N]o additional programming is required in the device at the point of sale. ***This additional programming is required so that the point of sale device can reach network devices outside the banking network***. The prior art necessity for custom programming at the point of sale suffers from the disadvantage of additional overhead, additional expense and programming, and the possibility, if not the likelihood that such custom programming could be corrupted or rendered obsolete by the overarching standards imposed by the financial processing institution which controls the use of point-of-sale devices in a banking network. Specifically, this custom programming can be overwritten if the financial institution changes the program of the point of sale device. ***The art of record accentuates the inability of prior art systems to use existing banking network already established at every retailer that takes credit cards***.

Appx1153-1154, Amendment at pp. 11-12 (***emphases*** added).

In sum, the District Court's construction of "unmodified" as referring to "any modification" is ***inconsistent*** with the Prosecution History.[5] The patentee used the

[5] Moreover, as is discussed in Part I., A., 2., below, the patentee's use of the term "unmodified" as described is consistent with the patentee's statements in the Specification that specifically contemplate some modifications will normally occur during operation of the systems claimed in the '608 Patent.

term "unmodified" to describe the absence of changes to the manner in which the POS communicates (e.g., transmits data) over a banking network.[6]

### 2. Previous District Court Constructions Of "Unmodified."

Before this case,[7] the '608 Patent was subjected to claim construction in nine (9) cases, seven (7) of which are/were in the Eastern District of Texas, and the remainder are in the Eastern District of New York and the Central District of California. *See* Appx0601-0783 (Dkt. No. 58-6) at Ex. E. ***Not one*** of these courts held that "any modification" to the POS device would take the accused system out of the claims; the one that was presented with that option (*Datastream*) rejected it. Instead, each of these courts included the further clarification: "for use in the card system."

The claim construction order in *AlexSam v. Datastream, et al* marked the first occasion that terms of the '608 Patent were construed (the "*Datastream* Order"). See Appx0602-0621. The construed terms included the term "unmodified." As is

[6] The claimed functions associated with the POS device are not limited to transmitting card data in ***unasserted*** claims, the device also obtains card data (e.g., via card "swipe") and purchase data (e.g., via "entering"). See, e.g., Appx0007-0021 ('608 Patent) at Claim 29, a. ("swiping the loyalty card through an unmodified existing standard retail point-of-sale device"), and 29, b. ("entering purchase data into the point-of-sale device.).

[7] Two cases were also filed in the Eastern District of Texas after this case; One case was resolved (EDTX Case No. 19-cv-82) and the other is in the process of being appealed (CAFC Case No. 2022-1598).

explained in Part I., A below, in the *Datastream* Order, Judge Ward considered some of the intrinsic evidence and ultimately reached what AlexSam perceives to be the proper construction. However, a significant part of the *Datastream* Court's analysis – which forms the basis for the District Court's further construction in this case – was based on a methodology that was abrogated by this Court one month after the *Datastream* Order issued. AlexSam believed that Judge Ward's full construction – including the Court's insertion of the phrase "for use in the card system" – was accurate because (i) the Court had rejected an "any modification" limitation proposed by the defendants, and (ii) the Court had included the clause after noting that the term "unmodified" was included at the request of the examiner to clarify that ***the claimed systems*** did not require modification of the point-of-sale. AlexSam's understanding of this construction was – and is – that only modifications to claimed functions performed by the point-of-sale device are relevant to infringement.

For well over a decade, AlexSam has relied on this understanding of the term "unmodified" in litigation and in business negotiations outside of litigation. Until this case, no litigant[8] or court had even proposed the construction adopted by the District Court in this case since it was rejected by Judge Ward in 2005.

---

[8] This includes the Appellee here who, to date, has not sought to defend the Court's "any modification" construction.

### 3. The Opinion In *AlexSam v. IDT*.

In September of 2007, AlexSam sued IDT Corporation in the Eastern District of Texas. After trial, IDT was found to have infringed claims 57 and 58 of the ‘608 Patent, which were also found to be not invalid. On appeal, the Federal Circuit affirmed the judgment of no invalidity and infringement based on the district court's discovery sanctions but reversed the jury’s finding of infringement regarding two other systems (the “Walgreen / EWI Systems”) (the “*IDT* Opinion”). With respect to the Walgreen / EWI systems, the Court found that AlexSam had provided only unsupported conclusions regarding whether the POS devices were unmodified.

However, in resolving the *IDT* appeal, the Federal Circuit did not address whether the parties’ stipulated claim construction was accurate, nor did it explain what the Court understood the phrase “for use in the card system” meant. Instead, the Court found that AlexSam had failed to present actual evidence to support its allegation that IDT’s system utilized an “unmodified” POS. As is explained below, AlexSam used the *IDT* Opinion as a template to craft its infringement contentions and allegations in this case.

## B. Relevant Procedural History

AlexSam filed this patent infringement case on March 18, 2020. Eastern District of Texas Docket Number (“Dkt. No.”) 1. See generally, Appx0120-0156 (Docket Report) at Appx0132. The case was assigned to District Judge Rodney

Gilstrap on March 19, 2020. After initial extensions, Cigna filed a motion to dismiss for failure to claim patentable subject matter pursuant to 35 U.S.C §101 with its answer on July 10, 2020. See id. at Appx0133 (Dkt. Nos. 11, 12). Cigna's motion was denied by Report & Recommendation and a subsequent order of the District Judge over Cigna's objections on October 26, 2020 (Report) and December 8, 2020 (Order), respectively.

On October 9, 2020, Magistrate Judge Roy S. Payne entered a Docket Control Order setting the case management dates, including a *Markman* Hearing set for April 6, 2021, before Magistrate Judge Payne, and Jury Selection before Judge Gilstrap on October 4, 2021.

The parties commenced discovery with AlexSam's Patent Local Rule 3-1 and 3-2 Disclosures on September 9, 2020, which set forth AlexSam's preliminary infringement contentions (the "Preliminary Disclosures"). See Appx1302-1333. In the Preliminary Disclosures, AlexSam disclosed its preliminary contention that the accused Cigna system (the "Accused System") met the "unmodified" POS limitation as follows:

> [u]pon information and belief, any point of sale terminal that accepts Visa cards is able to read and accept all Visa branded cards, such as the Cigna Visa Cards. See Exhibit 3 ("Cigna Debit Card: Use at point-of-sale with signature at no charge"). Upon information and belief, the POS devices have not been altered for use in the Cigna card system.

*See id*. at Appx1320.

The foregoing shows that AlexSam understood that the use of a standard POS device over a banking network (e.g., Visa) satisfied the "unmodified" limitation of Claims 32 and 33. Cigna did not challenge the sufficiency or the accuracy of AlexSam's understanding until after the *Markman* hearing in this case, as is described below.

During discovery, AlexSam served interrogatories, two of which are of particular significance here: (i) Interrogatory Number 1 asked Cigna to explain the basis for its allegation that it did not infringe the asserted claims, and (ii) Interrogatory Number 10 asked Cigna to "[i]dentify any modifications to any Point-Of-Sale Device that is allegedly required to use the device to perform any transaction involving any Accused Products …." See Appx1337-1338 (Rog No. 1) and Appx1345-1346 (Rog. No. 10). Cigna provided its ***initial responses and objections*** on December 14, 2020, in which it asserted only objections to both interrogatories. See Appx1334-1350. Cigna did not change its response to either interrogatory in its ***First*** Supplemental Responses on January 19, 2021. See Appx1351-1367.

In Cigna's April 21, 2021[9] ***Second*** Supplemental Responses (see Appx1368-1388), Cigna amended its response to Interrogatory No. 1 to include the generic

---

[9] As is explained, below, this was the day after the Magistrate Judge issued the Claim Construction in this case.

assertion: "AlexSam has not established that Cigna's Accused Products met all of the limitations of the Asserted Claims", before listing each of the components of the claimed system by name (e.g., "AlexSam has not established that Cigna's Accused Products include a "debit/medical services card," …). Id. at Appx1374-1375. Cigna did not supplement its Second Supplemental Response to Interrogatory No. 10 regarding any purported POS device "modifications." See id. at Appx1382-1383.

At the same time as the foregoing discovery, the parties were involved in the claim construction process, beginning (from the District Court's perspective), with the filing of a Joint Claim Construction and Prehearing Statement on January 12, 2021. See Appx0503-0564 (Dkt. No. 46). According to that chart, the parties' only disagreement with respect to the "unmodified" term (which is the last of 15 terms Cigna raised), was whether the phrase "of the type in use as of July 10, 1997" modified the word "terminal" or the word "purchases." See Appx0564. After AlexSam filed its Opening Claim Construction Brief on February 23, 2021 (see Appx0565-0600; Dkt. No. 58), Cigna filed its Response Brief on March 9, 2021. See Appx0784-0819; Dkt. No. 59). AlexSam filed its Reply Brief on March 16, 2021. See Appx0820-0833. Despite being aware of AlexSam's understanding of the "unmodified" term as disclosed in its Preliminary Disclosures, Cigna made no attempt to dispute AlexSam's understanding. After briefing was completed, Magistrate Judge Payne conducted a *Markman* Hearing on April 14, 2021. Again,

Cigna made no effort to dispute AlexSam's understanding of "unmodified." Magistrate Judge Payne entered a Claim Construction Memorandum And Order on April 20, 2021, in which he adopted the parties' agreed to construction of "unmodified." See Appx0022-0081, Claim Construction Order (Dkt. No. 71).

Thereafter, on May 17, 2021, Cigna supplemented its interrogatory responses for a ***third and final time***. See Appx1389-1412. In its responses, Cigna incorporated the following bare statement:

> AlexSam has not established that Cigna's Accused Products involved terminals that had not been reprogrammed, customized, or otherwise altered with respect to their software for use in a card system. The Federal Circuit previously held AlexSam "failed to present substantial evidence that the terminals used in [other defendants'] systems 'ha[d] not been reprogrammed, customized, or otherwise altered with respect to [their] software . . . for use in the card system.'" *AlexSam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1342 (Fed. Cir. 2013). The same is true of AlexSam's allegations against Cigna: it has not established that Cigna's Accused Products included or were used with unmodified existing standard point-of-sale devices.

Appx1397-1398. No further explanation was provided, nor did Cigna identify any purported modifications to the POS devices in response to Interrogatory No. 10, which circumstantially supports the conclusion that the devices are "unmodified."

On July 30, 2021, AlexSam and Cigna filed competing Motions for Summary Judgment of Infringement and Non-Infringement. See Appx0845-0877 (Dkt. No. 111) (Cigna) and Appx0878-0916 (Dkt. No. 117) (AlexSam). As part of the briefing

for its motion, AlexSam provided evidence and argument in support of its allegation that the Accused System used POS devices that had not been "modified" "for use in the card system." See, e.g., Appx0898-0899 (Dkt. No. 117) at pp. 17-18. Cigna did not substantively dispute that only modifications "for use in the card system" were relevant to infringement; instead, Cigna argued that AlexSam had not presented sufficient evidence to proceed to trial. See Appx0917-0939 (Dkt. No. 132) at p. 10. On August 9, 2021, AlexSam filed its opposition to Cigna's summary judgment on non-infringement. See Appx0940-970 (Dkt. No. 137). Briefing was completed on the competing motions for summary judgment after Replies and Sur-Replies were filed on August 16 and August 24, 2002. See Appx0971-0985 (Dkt. No. 156) (Cigna); Appx0986-0999 (Dkt. No. 161) (AlexSam); Appx1000-1012 (Dkt. No. 181) (AlexSam); and Appx1013-1021 (Dkt. No.184) (Cigna).

The Court did not initially set a hearing on the parties' competing motions for summary judgment. Instead, the case was scheduled for Pretrial Conference to be held on September 2, 2021. See Appx0092-0097 (Dkt. No. 97). However, as the parties were in transit to the Pretrial Conference on September 1, 2021, Magistrate Judge Payne issued a Minute Order setting Cigna's motion for summary judgment for hearing the next day.

Oral argument on Cigna's motion took place before Judge Payne following the Pretrial Conference. During oral argument, Cigna did not argue about the

construction of the term "unmodified;" instead, Cigna argued that the evidence presented by AlexSam was insufficient under the *IDT* Opinion. See Appx0212-0428 (9/2/2021 Hrg. Tr.) at pp. 129-134. Cigna focused its non-infringement arguments on perceived admissions by AlexSam's' expert in deposition and alleged deficiencies in the evidence presented. Id. In response, AlexSam's counsel explained that it had complied with the *IDT* Opinion by presenting the evidence that was found to have been missing in that case. Id., at 143-153 (e.g., 145-146 ("Well, we have different evidence here, Your Honor. There's a different approach. In fact, it's the very evidence that the *IDT* court found was missing, because the IDT court, again, did not say you must go to the POS devices; only that you address the issue of the unmodified POS device."), at 157-164. AlexSam's counsel also clarified that AlexSam was ***not*** arguing that the *IDT* Opinion was incorrect, although a reference to that argument was included in AlexSam's opposition brief.[10] Id. at 164. Thereafter, AlexSam sought leave to supplement the record to include additional evidence for the Court's consideration (the "Motion to Supplement"), which was opposed by Cigna. See Appx1022-1026 (Dkt. No. 201); Appx1027-1038 (Dkt. No.

---

[10] AlexSam mistakenly argued in its Opposition Brief that the Federal Circuit had erred in the *IDT* decision. AlexSam's inclusion of this argument was a mistake and was regrettable, and AlexSam notified the District Court at oral argument that that was not Appellant's position and that AlexSam honored and complied with this Court's *IDT* decision.

203).

On September 21, 2021, Magistrate Judge Payne issued a Report & Recommendation (the "R&R"), in which he, *inter alia*, adopted an interpretation of "unmodified" that had not been advanced by either party and had not been discussed by the Court in advance of its R&R. See Appx0101-0114 (Dkt. No. 218). The R&R also granted the Motion to Supplement but did not discuss the substance of the evidence presented other than to say it did not change the outcome. Id., p. 1, fn. 1.

AlexSam timely filed objections to the R&R on October 5, 2021 (the "Objections"). See Appx1039-1049 (Dkt. No. 221). Before the Objections were considered, AlexSam filed a notice in which it raised a question about an apparent conflict involving Judge Gilstrap that, while in private practice, Judge Gilstrap had participated in claim construction arguments on behalf of defendants and against AlexSam in the *AlexSam v. Datastream* case, which was at the epicenter of the R&R. See Appx1053-1055 (Dkt. No. 226-1).

After District Judge Gilstrap voluntarily recused himself, the case was reassigned to District Judge Robert W. Schroeder III (see Appx0100) and, after holding oral argument on AlexSam's Objections on February 10, 2022, Judge Schroeder overruled the Objections and adopted the R&R in its entirety on March 16, 2022. See Appx0001-0005 (Dkt. No. 248). Final Judgment was entered on

March 18, 2022. See Appx0006 (Dkt. No. 249). AlexSam timely appealed on March 31, 2022. See Appx1069-1071 (Dkt. No. 254).

## SUMMARY OF ARGUMENT

The District Court below erroneously adopted the flawed reasoning of the Magistrate Judge who failed to apply the current law of claim construction in construing the claim term "unmodified." As is explained below, the '608 Patent on its face contemplates that some "modifications" were required for implementations of certain preferred embodiments. See, e.g., Appx0007-0021 ('608 Patent) at col. 6, lines 47-51. The District Court's construction that "any modification" to the POS would drop the accused system outside the claims is thus contrary to the intrinsic evidence. Significantly, the District Court's construction had not been advocated by either party and was, in fact, not supported by either Appellant ***or Appellee***. Nevertheless, the District Court used its new construction to grant summary judgment against Appellant on a disputed issue of fact.

The District Court also erroneously adopted the Magistrate Judge's conclusion that (a) the *IDT* Opinion from this Court required a ***specific*** evidentiary showing of infringement, and that (b) Appellant had not presented sufficient evidence to proceed to trial. As is also explained below, the receipt of a debit transaction using a BIN routed over an existing banking network utilizing standard ISO 8583 message formatting and ISO 7813 card data formatting proves the POS

device at the point-of-sale was "unmodified." ***Critically, this conforms exactly to the operation of an "unmodified" POS as that term was explained by the applicant during prosecution of the '608 Patent***.

These errors, individually and collectively, support a reversal of the MSJ Order and remand for further proceedings.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment under the law of the regional circuit. See *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1356 (Fed. Cir. 2016). The Fifth Circuit, which includes the Eastern District of Texas, reviews a grant of summary judgment *de novo*. *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 747 (5th Cir. 2019) (citing *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 297 (5th Cir. 2017)).

An infringement analysis involves a two-step process: the court first determines the meaning of disputed claim terms and then the accused device is compared to the claims as construed. *Markman*, 52 F.3d at 976. "[T]he ultimate issue of the proper construction of a claim should be treated as a question of law," which the Federal Circuit reviews *de novo*. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326, 135 S.Ct. 831, 838 (2015). Any subsidiary factual findings related to claim construction are reviewed under the clearly erroneous standard. Id.; see also *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1378 (Fed. Cir. 2021)

(“We review claim construction based on intrinsic evidence *de novo* and review any findings of fact regarding extrinsic evidence for clear error.”).

Regarding claim construction, the Federal Circuit has explained: “[w]e generally give words of a claim their ordinary meaning in the context of the claim and the whole patent document; the specification particularly, but also the prosecution history, informs the determination of claim meaning in context, including by resolving ambiguities; and even if the meaning is plain on the face of the claim language, the patentee can, by acting with sufficient clarity, disclaim such a plain meaning or prescribe a special definition.” *World Class Technology Corp. v. Ormco Corp.*, 769 F.3d 1120, 1123 (Fed. Cir. 2014) (citing *Phillips*, 415 F.3d at 1312-17), and *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). “[A]n applicant’s amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment.” *Personalized Media Commun’s, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020).

Thereafter, whether an accused device or method infringes a claim either literally or under the doctrine of equivalents is a question of fact. Thus, on appeal from a grant of summary judgment of noninfringement, the Court must determine whether, after resolving reasonable factual inferences in favor of the patentee, the

district court correctly concluded that no reasonable jury could find infringement. *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1335 (Fed. Cir. 2019).

Finally, at summary judgment, the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In fact, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); accord *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2005).

The District Court's order at issue here does not apply these fundamental principles. AlexSam established to the District Court that its application of a previously unsought claim construction was in error and that summary judgment was not proper. Moreover, AlexSam established that it had presented sufficient evidence of the use of "unmodified" point-of-sale devices to proceed to trial.

## ARGUMENT

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That is not the case here.

First, the District Court adopted a construction of "unmodified" to resolve summary judgment that had not been advocated by either party. In arriving at this

new construction, the District Court failed to consider the intrinsic evidence, which shows that the new construction is in error. Second, the District Court applied its construction without prior notice and without allowing Appellant to present additional evidence or, alternatively, to advance a theory of infringement under the Doctrine of Equivalents. Third, the Court failed to analyze the totality of the evidence proffered by Appellant with the deference due to a non-movant and erroneously concluded that this Court previously proscribed an evidentiary standard requiring Appellant to show that "no modifications" ***at all*** were made to point-of-sale devices in the Accused System.

Moreover, Appellant respectfully submits that resolving the issues raised herein will provide this Court with an opportunity to clearly articulate the proper construction of the term "unmodified" as it is used in the '608 Patent, which affects both this and another appeal.[11]

## I. THE DISTRICT COURT FAILED TO PROPERLY CONSTRUE "UNMODIFIED".

The R&R effectively ended this case when it stated for the first time:

> *IDT* holds that Alexsam needed to prove whether any POS terminal used in the accused system was ***modified, at all, with respect to its hardware or software (i.e. without modification); not whether the terminals used in the***

[11] *AlexSam, Inc. v. Simon Property Group, Blackhawk Networks, Inc.*, Federal Circuit Case Number 2022-1598.

> ***accused system were solely modified for the purpose of being used in the accused system*.**

See Appx0101-0114 (R&R), at p. 10 (***emphasis*** added).

Notably, the R&R failed to include a citation to the *IDT* Opinion for this keystone position. Also, neither Judge Ward, who authored the *Datastream* Order and included the provision "for use in the card system," nor counsel ***for Appellee*** agrees that the Magistrate Judge's "any modification" construction is correct.[12]

---

[12] During oral argument before District Judge Schroeder, Cigna's counsel stated (with reference to Appellant's counsel, Mr. Davis, and counsel for Blackhawk Networks, Mr. Hoffman):

> Now, something that we heard from Mr. Davis this
> morning, one of the first things he said, actually, was
> that defense counsel was going to get up here and say ***any***
> ***modification*** cuts out this limitation. ***There can't be***
> ***infringement if there's any modification. I'm not going to***
> ***say that.*** I don't think I heard Mr. Hoffman say that. ***Any***
> ***modification for use in the card system, which is what***
> ***we're talking about***.
> So some of the things that Mr. Ritcheson said, if you
> put a sticker on the device, if you change the power cord,
> if you change the graphical user interface, we're not
> arguing that those kinds of modifications are the kinds of
> modifications contemplated by this construction***. And in***
> ***the Cigna case, we're not even talking about modifications*.**
> In the Cigna case, all we're saying is that they have no
> evidence regarding the point-of-sale devices.

Appx0429-0476 (2/10/2022 Hrg. Tr.) at p. 90, ll. 4-19 (***emphases*** added).

Nevertheless, the Magistrate Judge's improper construction was adopted by Judge Schroeder in granting summary judgment.

In adopting the R&R, Judge Schroeder took the position that Magistrate Judge Payne did not adopt a new claim construction but merely "clarified" the construction of unmodified. "Rather than present a new claim construction, the R&R clarified – in view of *IDT* – the claim scope and evidence necessary for AlexSam to meet its burden of showing infringement." Appx0002 (Order, p. 2[13]). However, the District Court "clarified … the claim scope," which ***is*** claim construction,[14] in light of matter ***extrinsic*** to the '608 Patent instead of the legally mandated ***intrinsic*** evidence that is at issue here. The District Court's subsequent determination as to the sufficiency of the evidence presented by AlexSam, who had applied the Court's prior construction, was based on this flawed understanding of claim scope.

---

[13] Thereafter, the Order incorrectly states that AlexSam was seeking a new construction in its opposition to summary judgment when it relied on its understanding of the construction of "unmodified." Appx0003 (Order, p. 3). ("AlexSam's new proposed claim construction, however, disregards both decisions [*IDT* and *Datastream*].") To be clear, Appellant believes that the *Datastream* construction is correct as it understands it and Appellant is not seeking, and has never sought, a new or different construction.

[14] "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman*, 52 F.3d at 976).

### A. THE DISTRICT COURT FAILED TO APPLY CURRENT FEDERAL CIRCUIT AUTHORITY IN CONSTRUING "UNMODIFIED".

In construing the term "unmodified" during summary judgment, the District Court below relied in large part on a prior claim construction analysis (*Datastream*) that employed a methodology that has been repudiated by this Court (*Texas Digital*). Moreover, the District Court below failed to undertake an analysis of the intrinsic evidence in reaching its conclusion regarding the proper construction of "unmodified." Finally, while asserting that it had applied the *Datastream* construction, the District Court below rejected two aspects of the *Datastream* Order (one implicit, one explicit). Specifically, the District Court failed to analyze or apply the phrase "for use in the card system," and it failed to honor the *Datastream* Court's rejection of a construction that includes "any modification".

#### 1. While the *Datastream* construction of "unmodified" was not wrong, the *Datastream* Court's reasoning was later abrogated, and the District Court's reliance on it below was in error.

The conclusions of fact and the ultimate construction reached by the *Datastream* Court should be separated from its claim construction analysis because one is correct, and the other is not in light of modern jurisprudence. See Appx0602-0621 (*Datastream* Order). First, the Court's recitation of relevant facts and ultimate construction of the term "unmodified" was correct. For example, the *Datastream* Court noted several important points. The "novel aspect of the invention" was the use of existing POS devices that were already pre-programmed to read bank

identification numbers (or "BINs"). See Appx0602-0621 (*Datastream* Order) at pp. 1-2. These BINs were used to route (i.e., send and receive) card transactions. Id. at p. 6 ("Banks use BIN tables in routing transactions to the appropriate bank for credit approval and final settlement.") (citing and quoting *Dictionary of Banking Terms* at 46 (Barons 3d ed. 1997)). "By incorporating a bank identification number into the card number, the inventor created a system that did not require retailers to modify and pre-program their existing POS terminals." Id. at p. 2.

Thereafter, the *Datastream* Court did not adopt – and thus rejected – the construction advanced by the defendants in that case, which was essentially that "any" modification to the POS would cause the system to fall outside the claims. See Appx0602-0621(*Datastream* Order) at p. 7 (Appx0608). ("The defendants propose a much more limited construction of this term to mean '*a terminal for making purchases* at a retail location of the type in use as of July 10, 1997, containing magnetic stripe reading electronics, ***that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware***.") (***Emphasis*** added.) The *Datastream* Court noted that the term "unmodified" was required by the examiner "to clarify that ***the systems claimed in the '608 Patent*** did not require any hardware and/or software modifications to the existing standard retail POS devices." Id. at p. 9 (***emphasis*** added). The *Datastream* Court then included a critical limitation, which has not been addressed by the District Court here: "a terminal for

making purchases at a retail location of the type in use as of July 10, 1997 that has not been programmed, customized, or otherwise altered with respect to its software or hardware ***for use in the card system***." Id. (***Emphasis*** added.) The plainest reading of the foregoing recitations of facts in light of the adopted construction is that the term "unmodified" relates to modifications to implement the communication (i.e., send/receive) functions performed by the POS devices in the claims. See Appx1102-1301 (Amendment) at pp. 10-12. The District Court in this case failed to properly evaluate either these factual findings or the actual conclusions reached by the *Datastream* Court.

Second, the *Datastream* legal analysis, which was relied upon by the District Court in this case, is not and cannot serve as a proper basis for the R&R or the MSJ Order. See, e.g., Appx0001-0005 (MSJ Order) at pp. 3-4. Specifically, the analysis performed by the *Datastream* Court relied on the principle that "dictionaries … are particularly useful resources to assist the court in determining the ordinary and customary meaning of claim terms." See Appx0602-0621 (*Datastream* Order) at p. 3, citing and quoting *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002). *Texas Digital* promoted a view that objective resources, such as dictionaries, "constitute unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic

record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation." Id., quoting *Texas Digital Sys., Inc.*, 308 F.3d at 1203.

The District Court in *Datastream* followed the *Texas Digital* methodology and adopted the view that the term "unmodified" should be interpreted, not by examining the intrinsic evidence, but by adopting a standard or "dictionary" definition. See Appx0602-0621 (*Datastream* Order) at p. 9 ("It is a stretch of grammar to propose a construction of the simple word 'unmodified' that is divorced from the meaning actually implied by the word itself, which is *without modification*.") (*emphasis* in original) (the "*Datastream* Analysis").[15] In fairness, that was not an error by the *Datastream* Court; it simply followed the law at the time.

However, one month after the *Datastream* Order, the Federal Circuit reexamined the legal principles of claim construction and concluded that "the *Texas Digital* line of cases … too often … improperly relied upon … a dictionary definition entirely divorced from the context of the written description." *Phillips*, 415 F.3d at

[15] This language serves as the analytical underpinning of both the R&R and the MSJ Order. See Appx0101-0114 (R&R) at p. 6 (quoting *Datastream* Analysis), 9 (same); and Appx0001-0005 (MSJ Order) at pp. 3-4 ("Importantly, the R&R highlighted the *Datastream* Court's determination of the meaning of 'unmodified' and how '[i]t is a stretch of grammar to propose a construction of the simple word "unmodified" that is divorced from the meaning ***actually implied*** by the word itself, ***which is without modification***.' [*Datastream* citation omitted] (emphasis in R&R). The Court does not find the R&R's analysis and conclusions concerning *Datastream* to be erroneous.").

1321. *Phillips* marked an inflection point, returning the focus of claim construction to the intrinsic evidence. The Federal Circuit in *Phillips* concluded that: "[a]lthough the concern expressed by the court in *Texas Digital* was valid, the methodology it adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history." *Phillips*, 415 F.3d at 1320. "That approach, in our view, improperly restricts the role of the specification in claim construction." Id. The Federal Circuit continued:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry ***on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent***. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term ***in the abstract, out of its particular context***, which is the specification. … As the Supreme Court has stated, "[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."
> …
> The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, ***the error will systematically cause the construction of the claim to be unduly expansive***.

*Phillips*, 415 F.3d at 1321, citing and quoting *Merrill v. Yeomans*, 94 U.S. 568, 573-474 (1876) (***emphases*** added). The Federal Circuit therefore abrogated the *Texas Digital* methodology, and thus, the *Datastream* Analysis.

In the instant case, the District Court followed only the objectionable part of *Datastream* (the "dictionary" – based *Datastream* Analysis) and not the non-objectionable parts (the findings of fact and the construction actually entered by the *Datastream* Court). Specifically, the District Court failed to examine the intrinsic evidence and instead decided that the meaning "implied by the word itself" would control the meaning of "unmodified" as used in the '608 Patent. This was error.

**2. Properly construed, "unmodified" refers to the claimed functions, not to "any" modification.**

The only court to conclude that "unmodified" refers to "any" modifications was the District Court in this case, which reached this conclusion without examining the intrinsic record. If the prosecution history for the '608 Patent (the "Prosecution History") and the Specification of the '608 Patent had been consulted, as required by *Phillips*, the District Court would have learned that its construction was not supported by the intrinsic evidence.

First, the Prosecution History describes the meaning of "unmodified" within the context of the claimed inventions, specifically, the communication (i.e., send/receive) functions performed by the claimed POS devices. See Appx1152-1154 (Amendment) at pp. 10-12. Thus, a conclusion that "any modification" (including

modifications to unclaimed functionality) would cause a system to fall outside the claims is contrary to the intrinsic evidence, which is error. See *Kinetic Concepts, Inc. v. Blue Sky Medical Group*, 554 F. 3d 1010, 1018-1019 (Fed. Cir. 2009) (a broad term could not be read so broadly as to conflict with the intrinsic evidence). Instead, as the patentee explained in his explanatory remarks with his amendment that added "unmodified," "[N]o additional programming is required in the device at the point of sale. ***This additional programming is required so that the point of sale device can reach network devices outside the banking network***." Appx1153-1154 (Amendment) at p. 11-12. ***That*** was what the inventor sought to avoid, and ***that*** is what was meant by "unmodified." See *Personalized Media Communic's, LLC*, 952 F.3d at 1340 ("[A]n applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment.").

Second, the '608 Patent Specification itself anticipates that ***some*** modifications will be made to POS devices used in the claimed system. See, e.g., Appx0007-0021 ('608 Patent) at col. 5, lines 33-38 ("Depending upon the amount of customization[[16]] that has occurred at the retailer's location, there are a number of ways in which the POS device 105 may connect to the system's 108 processing

---

[16] According to the *Datastream* construction, "customization" is a form of "modification."

hub … .”); col. 9, ll. 47-51 (disclosed methods of using invention “… require some customization at the retailer location to cause the retailer to connect to a bank processor 209 that recognizes the system’s BIN.”); col. 9, lines 57-64. Thus, a conclusion that “***any***” modification to a POS would cause a system to fall outside the ‘608 Patent is contrary to the Specification, which expressly teaches that ***some*** modifications to the POS devices are contemplated when practicing certain embodiments of the claimed invention.

Support for the foregoing also can be found in the *Datastream* Order itself. While the District Court stated that it was following the *Datastream* Order, that order in fact rejected an “any” modifications interpretation and correctly limited the construction to exclude only modifications “for use in the card system.” This language, read together with Judge Ward’s finding that the term “unmodified” was “required [by the examiner] … to clarify that ***the systems claimed in the ‘608 Patent*** did not require any hardware and/or software modifications to the existing standard retail POS devices,”[17] supports the conclusion that “for use in the card system” should be understood to mean “to perform the claimed functions.”

In sum, properly construed, the term “unmodified” relates only to modifications to the point-of-sale device of the Accused System to allow the device

[17] Appx0602-0621 (*Datastream* Order) at p. 9 (***emphasis*** added).

to send card data to the transaction processor, which is the only function described in Claim 32.[18] Specifically, paragraph b of Asserted Claim 32 claims: "a transaction processor ***receiving card data from an unmodified existing standard point-of-sale device***, ... ." (***Emphasis*** added.) The District Court's conclusion that AlexSam was required to show that ***no modifications at all*** were performed on the POS devices of the Accused System, which is contrary to the findings in *Datastream*, is incorrect.

### 3. The *IDT* Court Did Not Rule On The Meaning Or Accuracy Of The Stipulated Claim Construction; The Court Did Find Certain Evidence Insufficient Alone.

In *IDT*, the Federal Circuit criticized AlexSam's experts in that case for not relying on sufficient evidence to support their testimony that the IDT terminals were unmodified. Specifically, AlexSam's experts testified at trial only that no modifications were "required" because the IDT system only "requires the same capabilities as reading a standard credit card or debit card." (Emphases in original.) The Federal Circuit noted that,

> ***At no point did Baker testify, except in the cursory manner described above, that no modifications were actually made to the terminals' software in order to allow them to activate IDT's cards***. Indeed, Baker admitted on cross-examination that his testimony was ***limited to what was "required"*** in order to activate an IDT card, and that

[18] For claims that include other functionality, for example, "entering" (unasserted claim 27) ("entering an amount into the [unmodified existing standard retail] point-of-sale device"), this function would be the focus of the "unmodified" limitation of the claim.

> ***he had not expressed an opinion as to whether the actual POS terminals used in the IDT systems had been "reprogrammed, customized, or otherwise altered" in any way***. … [AlexSam's expert] further testified that ***he had not spoken with IDT's retail or intermediary partners or with POS suppliers about the terminals*** used in IDT's systems. Finally, when pressed further, he admitted that he was "***not an expert on [POS] terminals***."

Appx1072-1101 (*IDT* Opinion) at pp, 8-9. (***Emphases*** added.)

The *IDT* Court thus found three defects: (1) the testimony was limited to what was "required" not what was "actually" done (referred to hereinafter as "[IDT 1]"); (2) the expert had no information from the defendant's "intermediary partners or … POS suppliers" (referred to hereinafter as "[IDT 2]"); and (3) AlexSam's experts were not "expert[s] on [POS] terminals" (referred to hereinafter as "[IDT 3]").

In this case, AlexSam cured the defects found by the Federal Circuit in *IDT*. For example, it is undisputed that AlexSam's expert, Mr. Zatkovich, is an expert on POS terminals[IDT 3]. See Appx1413-1655 (Zatkovich Infringement Report ("Infr. Rpt.")) at ¶¶5-16 (e.g., ¶7 (expert in "Point-of-Sale payment gateways"), ¶9 (qualified expert in "credit card processing and secure financial transactions"), ¶14 (testimony in "card processing and secure financial transactions", "provided expertise in point-of-sale credit card transactions and secure transaction processing"); id. ("provided expertise in point-of-sale card transactions, card activation, and wireless transactions").). As a POS expert, Mr. Zatkovich expressed his opinion that the POS devices used in the Cigna systems had not been modified

in order to allow them to function for use in the card system. See Appx1413-1655 (Infr., Rpt.) at §10.4. Mr. Zatkovich supports his opinions with citations to the very facts that were identified by the Federal Circuit as missing from the *IDT* case, including testimony from "intermediary partners."[IDT 2] This testimony allowed Mr. Zatkovich to opine that Cigna's cards perform transactions using "an unmodified standard retail point-of-sale device." Appx1413-1655 (Infr., Rpt.) at §10.4, ¶¶129-139. This expert opinion was supported by additional evidence–including standards promulgated by the International Organization for Standardization ("ISO") - presented by AlexSam.[IDT 1] [IDT 2] See, Part II, below.

These facts and arguments are ignored in the R&R and the MSJ Order but should be considered now in resolving this Appeal as part of this Court's *de novo* review. When considered, the evidence and opinions presented by AlexSam and its expert are sufficient to meet the holding of *IDT*, and the MSJ Order should be vacated and this case remanded for further proceedings.

### B. THE COURT ERRED BY ADOPTING A CLAIM CONSTRUCTION DURING SUMMARY JUDGMENT WITHOUT PRIOR NOTICE.

It is not unusual for a district court to revisit stipulated constructions as a case progresses. See *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) ("[P]arties in patent cases frequently stipulate to a construction or the court construes a term, only to have their dispute evolve to a point where they realize

that a further construction is necessary.”). It ***is*** unusual that this District Court used an unadvocated-for construction to grant summary judgment without prior notice.

Although courts sometimes provide claim constructions “on a rolling basis,” Appellant can find no cases in which a District Court performed such an analysis without prior notice to the parties; in fact, prior notice appears to be expected before an adjustment to claim construction is undertaken by the court. See, e.g., *Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1315-16 (Fed. Cir. 2010) (“recognizing the potential for surprise and prejudice in late adjustment to the meaning of claim terms,” but finding adjustment of claim construction permissible because “the district court made the adjustment early enough” to give the defendant “an opportunity to consider the new construction and adjust its arguments to account for the change”)).

In comparison, the District Court here modified the parties’ claim construction during summary judgment and then granted summary judgment based on the Court’s previously undisclosed construction. Notably, the construction of “unmodified” that was adopted by the District Court had not been advanced by either party. The briefing, including AlexSam’s marshalling of evidence, was thus directed toward a different understanding of the construction than that which was adopted by the District Court. If Appellant had been aware of the possibility of the District Court’s

construction, it would have included different evidence and arguments in the briefing. Appellant may also have advanced a Doctrine of Equivalents argument.

In sum, the District Court's construction of "unmodified" that prohibits "any modification" whatsoever was erroneous. And because the District Court relied on that erroneous construction in granting Appellee summary judgment, that judgment stands to be overturned here. But the MSJ Order also stands to be overturned because the District Court, while performing a "rolling" claim construction, failed to provide sufficient notice to allow Appellant to comply with the District Court's understanding of the construction of "unmodified." In that regard, it is significant that the District Court's understanding had not only not been advanced by either party, but also, both parties appear to agree it was wrong (that the correct construction is not "any modification."). See Appx0429-0476 (2/10/2022 Hrg. Tr.) at p. 90, ll. 4-17.

## II. THE DISTRICT COURT FAILED TO PROPERLY EVALUATE THE EVIDENCE PROFFERED BY ALEXSAM AND ITS EXPERTS.

### A. THE DISTRICT COURT MISAPPLIED THIS COURT'S HOLDING IN *IDT*.

*What the IDT decision did not do*. Importantly, the Federal Circuit in *IDT* only noted that the parties in that case had stipulated to the construction of "unmodified"; the Court did not analyze or comment on the correctness or meaning of that construction, which it could have done if the parties there had raised such a dispute. See, e.g., *Digital Ally, Inc. v. Taser International, Inc.*, 810 Fed. Appx. 873,

875 (Fed. Cir. 2020) (non-precedential) (resolving parties' "vigorous[] dispute" over district court's understanding of parties' stipulated construction of "correlation data;" dispute resolved by, *inter alia*, referring to intrinsic evidence). This is consistent with the fact that claim construction is a matter of law, which is reviewed without deference. See *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*). Moreover, it appears that the *IDT* Court did not consider, let alone explain, the meaning of the phrase "for use in the card system", because that issue was not raised by either party and thus was not before the *IDT* Court. Nevertheless, the District Court below agreed with the Magistrate's erroneous conclusions that the *IDT* Court had in fact (i) "squarely reject[ed] Alexsam's proposed construction …," and (ii) "[held] that Alexsam needed to prove whether any POS terminal used in the accused system was modified, at all, with respect to its hardware or software (i.e. without modification); not whether the terminals used in the accused system were solely modified for the purpose of being used in the accused system." MSJ Order, p. 3 (citing and quoting Appx0101-0114 (R&R), pp. 9-10). These conclusions are not supported by any pin cite to the *IDT* Opinion and neither are found in the text of that opinion. Simply, the *IDT* Court did not act as the District Court found.

Likewise, the *IDT* Court did not identify the specific facts that must be proved at trial to show infringement; instead, it concluded that the facts presented by

AlexSam at ***that*** trial, alone, were not sufficient. Moreover, the Court did not find the facts presented were irrelevant, only that further support was required.

*What the IDT decision did do*. The *IDT* Court did hold that the facts AlexSam relied on in ***that*** case were insufficient alone to carry AlexSam's burden. In essence, the Court found that AlexSam's evidence was too speculative for the jury to have found infringement because, it appears, the expert testimony was not tailored to the defendant's actual system. See, e.g., Appx1072-1101 (*IDT* Opinion) at pp. 10-11 ("We conclude that Alexsam failed to present substantial evidence that the terminals used in IDT's Walgreens and EWI systems 'ha[d] not been reprogrammed, customized, or otherwise altered with respect to [their] software … for use in the card system.'") (Inserts in original.)

In conclusion, while the *IDT* Court did not identify specific evidence that must be presented to demonstrate the existence of a triable issue of fact, the Court did find that, at trial, it was not sufficient to rely solely on the testimony of an expert (i) who was not an expert in point-of-sale devices, (ii) who had not spoken to the intermediary partners of the accused infringer, and (iii) had not reviewed evidence of the actual operation of the POS devices used in the accused infringer's system.

## B. ALEXSAM'S EVIDENCE WAS SUFFICIENT TO PROCEED TO TRIAL.

In addition to adopting and applying an incorrect claim construction, the District Court found that the *IDT* Opinion prevented Appellant from proceeding to trial. This finding, too, was erroneous.

In opposing summary judgment, AlexSam adhered unwaveringly to the language of the parties' stipulated claim construction. As is explained below, AlexSam utilized the opinion of a POS expert[IDT 3], who reviewed the information actually obtained from Cigna's intermediary partner (Alegeus)[IDT 2], that the POS devices used to transmit card data to Alegeus were unmodified for such transmission[IDT 1]. See Appx1413-1655 (Infr. Rpt.).

The District Court erroneously concluded that the evidence of infringement produced by AlexSam was not distinguishable from the evidence presented in *IDT*. This was error because the District Court failed to consider that Appellant had tailored its evidence in this matter to address the evidentiary flaws that were identified by this Court in *IDT*.

### 1. The Legal Framework.

Appellant respectfully submits that the District Court erred by failing to accord deference to the expert and other evidence presented by AlexSam as nonmovant in opposition to summary judgment.

First, Appellant was not required to conclusively prove that the Accused System utilized "unmodified" point-of-sale devices. Instead, Appellant was required to present sufficient evidence that a factual dispute existed that required resolution by a jury. See *Anderson*, 477 U.S. at 248-249 ("It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, ***all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial***.") (Citation omitted) (***emphasis*** added).

Moreover, the District Court failed to consider that Appellant's expert opinion[IDT 3] was entitled to further deference, as such opinion is sufficient to defeat summary judgment in the Fifth Circuit. See *Genband US LLC v. Metaswitch Networks Corp*., No. 2:14-CV-33-JRG-RSP, 2016 U.S. Dist. LEXIS 37946, at *11 (E.D. Tex. Jan. 6, 2016) ("opinion of a qualified expert" supporting plaintiff's infringement arguments "giv[es] rise to a genuine fact dispute"); *Vasudevan Software, Inc. v. MicroStrategy, Inc*., 782 F.3d 671, 683 (Fed. Cir. 2015) ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case.").

### 2. Appellant produced evidence that the POS devices were unmodified based on actual data flow from the POS.

Applying the parties' stipulated construction, AlexSam must show that the card processor (here, Alegeus) received card data from a POS device that had not been modified to transmit (the function performed by the POS device in Asserted Claim 32) card data to the processing hub via the transaction processor.[IDT 1]

In this case, AlexSam presented evidence that is sufficient to support AlexSam's allegation that the Accused System – which connects the point of sale to the processor's processing hub through the transaction processor – used unmodified POS terminals by ***looking to the data that was actually received*** by the processor. As Mr. Zatkovich explained in his expert report,[19] the evidence shows that the Accused System actually uses ISO standard messaging, which includes ISO 8583 (defining how data is transmitted and received between a POS device and a transaction processor and processing hub). Distinct from the situation in *IDT*, this expert testimony is supported by the evidence specifically obtained from Cigna's intermediary, Alegeus:

> Q: ***Does Alegeus receive this data listed in these various fields for all transactions relating to its cards as processed at point-of-sale terminals?***

[19] Appx1413-1655 (Zatkovich Infr. Rpt.) at ¶¶238-39.

> A: ***Alegeus receives -- the data may not always be filled in, as indicated here, but receives these fields as part of ISO messages for all of the transactions. It's not always completed, there's not always data in them, but the fields would always exist.***
>
> Q: That's true for Cigna or any other client of Alegeus, is that right?
>
> A: That is correct.

Appx1716-1740 (Holmes Depo.) at pp. 208:19-209:7 (***emphases*** added).[IDT 1] [IDT 2]

> Q:…Now, you've described this document as being ***generally relevant to the March 2014 to July 2017 time period,*** is that correct?
>
> A: That's my understanding, yes. That ***this is an ISO format message that they would have received during that time period***. Could there have been tweaks to it post that time period that are updated in this document? It's possible.
>
> Q: Is it fair to say that the document in the middle states that ***the messages that are sent from the point of sale utilize the ISO 8583 format?***
>
> A: ***Correct***.
>
> Q: ***ISO 8583 is standard ISO messaging, correct?***
>
> A: ***That's my understanding, yes.***
>
> Q: ***And that's compatible with standard payment transactions, correct?***
>
> A: ***That's my understanding.***
>
> Q: ***And that's for standard payment transactions actually from standard point-of-sale devices, is that correct?***
> …

> A: Yeah. ***To my knowledge, this is all standard. Debit card processing would include the message format, yes.***
>
> Q: And I think you've testified previously that Alegeus doesn't require any modifications to point-of-sale devices so that the Cigna cards can be used in the Alegeus system, is that correct?
>
> MR. BONILLA:· Object to form.
>
> A: That is correct.

Appx1716-1740 (Holmes Depo.) at pp. 238:7-239:17 (***emphases*** added).[IDT 1] [IDT 2]

As Cigna's processor succinctly stated in deposition:

> Q:…So when you say a transaction is sent ***from the terminal through the Visa network***, ***what does that transaction consist of?***
>
> A: ***It's a standard debit card transaction. It's an ISO message that is required by the networks***, so not unique to Alegeus in that sense. It is sent through the network itself, and it includes the amount that's being spent, it includes the merchant category code of where it's being spent, as the two primary mechanisms. ***And obviously the card number is in there as well. So that, A, it's routed by the network to actually be sent to Alegeus based on, again, the bank identification number, or BIN.*** And it's those components that we then take into consideration when we're performing an authentication.

Appx1716-1740 (Holmes Depo.) at pp. 179:16-180:10 (***emphases*** added).[IDT 1] [IDT 2]

Tellingly, the foregoing description aligns with the description of the claimed invention that was provided by the Applicant with his amendment. <u>See</u> Appx1152-1153 (Amendment) at pp. 10-11 ("As discussed [with the Examiner] and agreed, the

Stimson system cannot function in an existing banking network, since Stimson lacks the critical feature of the bank identification number on the card which permits access to the banking network."); ("By utilizing the ubiquitous existing banking network, custom software is not necessary at the activating location where the card is either activated or utilized to gain information. Thus, existing point-of-sale devices known in the art for processing credit card and/or debit card transactions can be utilized without modification.").

Appellant also produced the opinion of an expert in POS devices, Mr. Zatkovich, who confirmed that, based on his review of the evidence, the POS devices used in the Accused System were unmodified. See, e.g., Appx1413-1655 (Zatkovich Infr. Rept.) at Section 10.4.[IDT 3] Mr. Zatkovich also offered his expert opinion that each Cigna card included standard card data, including a BIN. Id., ¶¶88-89, 131, 137. In short, the receipt of a debit transaction using a BIN routed over an existing banking network utilizing standard ISO 8583 message formatting and ISO 7813 card data formatting proves the POS device at the point-of-sale was "unmodified."[IDT 1] [IDT 2] [IDT 3] ***Critically, this conforms exactly to the operation of an "unmodified" POS as that term was explained by the applicant during prosecution of the '608 Patent***. Moreover, this conforms to the repeated holdings of this Court that an applicant's amendment and explanatory remarks can define a claim term. See, e.g., *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed. Cir. 2014);

*Personalized Media Communic's, LLC*, 952 F.3d at 1340. Notably, this is true when the applicant's comments – as is the case here – relate to the prior art. See, e.g., *SpeedTrack, Inc.*, 998 F.3d at 1378-1380; cf. also *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1339 (Fed. Cir. 2022) (vacating entry of summary judgment of non-infringement, remanding for further proceedings).

In short, the applicant here added an amendment that included the term "unmodified" to traverse a specific prior art reference (*Stimson*) and explained what was intended by that amendment. This intrinsic evidence, which was not reviewed by the District Court below in determining the meaning of "unmodified," defined or at least informed the proper construction of the term.

Cigna's only response to AlexSam's proffer was to mischaracterize and take out of context the deposition testimony from Mr. Zatkovitch.

> Q: Do you see the subsection there 10.4, "CIGNA cards perform transactions using 'an unmodified standard retail point-of-sale device'"?
>
> A: I see that.
>
> Q: ***Do you have any opinion*** here as to whether the accused systems from 2014 to 2017 actually did receive card data through unmodified standard retail point-of-sale devices?
>
> A: ***Well, other than we have specific documentation that says this is how the cards are used, do I have personal knowledge of that***; is that what you're asking?
>
> Q: ***No***.· I'm asking a little bit of a different question.

> A: Okay.
>
> Q: In this section, you talk about how card data can be captured via an unmodified POS device and that these devices can transmit.
>
> My question is:· ***Do you have*** ***<u>an opinion or evidence</u>*** that the accused system actually was used with unmodified point-of-sale devices from 2014 to 2017?
>
> A: ***The CIGNA marketing material*** indicates that they're intended to be used at standard retail point-of-sale devices.
>
> Q: That they're intended to be used at standard retail point-of-sale devices perhaps, ***but do <u>you</u> have any <u>evidence</u>*** that they actually, in fact, were used at unmodified point-of-sale devices during the relevant time frame?
>
> A: ***Do <u>I</u> have <u>proof</u>*** if any of the thousands of cards and the hundreds of thousands of transaction that occurred actually occurred at an unmodified standard retail point-of-sale device?· ***No, I have no <u>personal</u> knowledge*** of that.

Appx1776; Zatkovich Depo., 139:6-140:15 (***emphases*** and ***<u>emphases</u>*** added).

Appellee only presented the final answer from Mr. Zatkovich in support of its motion, without explaining the context of it. Simply, Cigna's counsel asked a series of shifting questions: (i) did the witness have an opinion?; (ii) did the witness have an opinion or evidence?; and finally, (iii) did the witness (an expert and not a fact witness) ***himself*** have evidence? As can be seen from the foregoing exchange, Mr. Zatkovich testified he was willing to discuss the specific evidence supporting his opinion that the Accused System used unmodified POS devices but that he, himself, had no ***personal*** knowledge of the operation of the system because he was relying

on ***Cigna's*** documents. Cigna's counsel chose not to inquire further regarding the factual underpinnings supporting Mr. Zatkovich's opinions.

But even if there is uncertainty about Mr. Zatkovich's testimony, this is the sort of dispute that requires resolution by a jury. See *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Anderson*, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor."). In sum, Mr. Zatkovich's testimony is not a reason to forgo trial; it is the reason to hold one.

## CONCLUSION

The District Court's MSJ Order should be vacated and the case remanded so that AlexSam can have its day in court.

Dated: October 31, 2022

Respectfully submitted,

*/s/ Jacqueline K. Burt*

Jacqueline K. Burt
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Ste. 4320
Atlanta, Georgia 30339
Email: jburt@hgdlawfirm.com
Telephone: (404) 996-0861
*Attorney for Plaintiff-Appellant, AlexSam, Inc.*

No. 2022-1599

IN THE
**UNITED STATES COURT OF APPEALS**
FOR THE FEDERAL CIRCUIT

ALEXSAM, INC., *Plaintiff-Appellant*

v.

CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, AND CIGNA HEALTHCARE OF TEXAS, INC., *Defendants-Appellees.*

**Appeal From The United States District Court**
**For The Eastern District of Texas In Case No. 2:20-cv-00081-RWS-RDP,**
**Honorable Robert W. Schroeder III**

# ADDENDUM

# TABLE OF CONTENTS


| | RANGE | DESCRIPTION | No. | Date (m/d/y) |
|---|---|---|---|---|
| 1. | Appx0001-Appx0005 | Order Adopting [218] Report And Recommendations re: [111] Defendants' Motion For Summary Judgment Of Non-Infringement | 248 | 3/16/2022 |
| 2. | Appx0006-Appx0006 | Final Judgment | 249 | 3/18/2022 |
| 3. | Appx0007-Appx0021 | U.S. Patent No. 6,000,608 | 1-2 | 12/14/1999 |
| 4. | Appx0022-Appx0081 | Memorandum and Order re: Claim Construction | 71 | 4/20/2021 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ALEXSAM, INC., *Plaintiff*, | § | |
| v. | § | Case No. 2:20-cv-00081-RWS-RSP |
| CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, and CIGNA HEALTHCARE OF TEXAS, INC., *Defendants*. | § | |

**ORDER**

Before the Court are two motions: (1) the Motion for Summary Judgment of Non-Infringement ("Non-Infringement Motion") (Docket No. 111) filed by Defendants Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company and Cigna Healthcare of Texas, Inc. (collectively, "Defendants" or "Cigna") and (2) the Motion for Summary Judgment of Infringement ("Infringement Motion") (Docket No. 117) filed by Plaintiff AlexSam, Inc. ("AlexSam"). Magistrate Judge Payne entered a Report and Recommendation ("R&R") (Docket No. 218) and recommended granting the Non-Infringement Motion (Docket No. 111) and denying the Infringement Motion (Docket No. 117). AlexSam has filed Objections (Docket No. 221) to which Cigna has responded (Docket No 234). The Court held a hearing on these motions on February 10, 2022. Docket No. 243.

The Court reviews the objected-to portions of the R&R *de novo*. *See* FED. R. CIV. P. 72; *see also* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings and recommendations to which objection is

made.”). The Court conducting a *de novo* review examines the entire record and makes an independent assessment under the law. *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

After review of the R&R and the Federal Circuit’s determination in *AlexSam, Inc. v. IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013) (“*IDT*”), the Court agrees with the opinions articulated in the R&R. The R&R sufficiently addressed the metes and bounds of *IDT* and carefully applied *IDT’s* reasoning to the facts of this case. Accordingly, Magistrate Judge Payne determined that Defendants did not infringe the asserted patent—U.S. Patent No. 6,000,608 (the “ ’608 Patent”).

AlexSam argues in response it “found at least three substantive errors in the R&R.” Docket No. 221 at 2. The Court addresses each of AlexSam’s objections in turn. First, AlexSam argues that “the R&R fails to apply the parties’ agreed upon claim construction for ‘unmodified . . . .’ ” *Id*. at 2. AlexSam states that the R&R did “not apply the construction or evaluate its impact on the parties’ summary judgment arguments. Instead, the R&R applied a new claim construction . . . .” *Id*. at 5.

Contrary to AlexSam’s assertion, the R&R does not present a new claim construction. At the outset, the R&R noted the parties’ agreed upon claim construction for the term “unmodified existing standard POS device” is “a terminal, for making purchases, that is of the type in use as of July 10, 1997, and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system.” Docket No. 218 at 5–6 (citing Docket No. 71 at 59). Rather than present a new claim construction, the R&R clarified—in view of *IDT*—the claim scope and the evidence necessary for AlexSam to meet its burden of showing infringement.[1]

[1] Further, AlexSam’s concern about the R&R’s clarification of the scope of the asserted claims is misplaced. *See O2 Micro Int’l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362–63 (Fed. Cir. 2008) (When the parties have a “fundamental dispute regarding the scope of a claim term,” the Court has the duty to resolve that dispute.). Courts have an affirmative duty to clarify a claim’s scope before trial. *Id*. Magistrate Judge Payne appropriately did so here.

As the R&R properly noted, "[t]he non-infringement analysis at the summary judgment stage requires the Court to compare the patent claims *as construed* with the accused device." Docket No. 218 at 5 (citing *Convolve, Inc. v. Compaq Comp. Corp.*, 812 F.3d 1313, 1317 (Fed. Cir. 2016) (emphasis added)). The R&R then went on to detail how:

> The Federal Circuit reviewed the *IDT* District Court Case claim construction, which is virtually identical to this Court's claim construction, and left it undisturbed. Further, *IDT* squarely rejects Alexsam's proposed construction and articulates that the claim language is not limited to "closed systems" but rather is applicable to all POS terminal devices used in the accused system (regardless of "closed" or "open" status). *IDT* holds that Alexsam needed to prove whether any POS terminal used in the accused system was modified, at all, with respect to its hardware or software (i.e. without modification); not whether the terminals used in the accused system were solely modified for the purpose of being used in the accused system.

Docket No. 218 at 9–10 (internal citations omitted). The Court agrees with the R&R's discussion, analysis and application of *IDT*.

Second, AlexSam argues that it has followed precedent and faithfully applied *IDT* and *AlexSam, Inc. v. Datastream Card Servs. Ltd.*, No. 2:03-cv-337, 2005 WL 6220095 (E.D. Tex. June 10, 2005) ("*Datastream*"). Docket No. 221 at 6–7. AlexSam's new proposed claim construction, however, disregards both decisions. The R&R provides a lengthy discussion of both *IDT* and *Datastream*. Docket No. 218 at 6–10. The R&R noted how in propagating its agreed construction of "unmodified existing standard POS device," this Court "largely adopted the *Datastream* construction, except with the addition of commas offsetting the 'for making purchases' phrase. The Court construed the term in this manner to clarify and denote that the phrase 'of the type in use as of July 10, 1997' modifies the word 'terminal'—not 'purchases.' " Docket No. 218 at 6. Importantly, the R&R highlighted the *Datastream* Court's determination of the meaning of "unmodified" and how "[i]t is a stretch of grammar to propose a construction of the simple word 'unmodified' that is divorced from the meaning ***actually implied*** by the word

itself, ***which is without modification***." *Id.* (citing *Datastream*, 2005 WL 6220095 at *5.) (emphasis in R&R). The Court does not find the R&R's analysis and conclusions concerning *Datastream* to be erroneous.

Further, AlexSam indicates that its proposed construction is antithetical to *IDT*. While AlexSam admits that "although the [Federal Circuit] in *IDT* quoted the full construction," it argues that this Court should overlook that important fact and instead interpret "for use in the card system" in a different manner than the Federal Circuit prescribed. Docket No. 221 at 6. The Court agrees with the R&R—that "*IDT* squarely rejects AlexSam's proposed construction and articulates that the claim language is not limited to 'closed systems' "—and will follow the Federal Circuit's precedent in *IDT*. Docket No. 218 at 9–10.

Third, Plaintiff argues that "the R&R failed to examine the totality of the evidence presented by AlexSam and its expert in the light most favorable to AlexSam as the non-movant." Docket No. 221 at 2. As noted in the R&R, the evidence gathered in this case is materially the same as in *IDT*. Docket No. 218 at 11. In *IDT*, the Federal Circuit "conclude[d] that AlexSam failed to present substantial evidence that the terminals used in IDT's Walgreens and EWI systems 'ha[d] not been reprogrammed, customized, or otherwise altered with respect to [their] software . . . for use in the card system." *IDT Corp.*, 715 F.3d at 1342. Here, there is no substantial difference between what was presented in *IDT* and what AlexSam presented before this Court at summary judgment. *See* Docket No. 218 at 11.

AlexSam admits "it did not analyze whether the systems had been 'reprogrammed, customized or otherwise altered' 'in any way' " because it was operating under a different interpretation of the claims. Docket No. 221 at 6. As such, AlexSam uses its evidence to support what is ultimately an incorrect view. As the R&R explained, "AlexSam's evidence in this case,

like its evidence in *IDT*, simply shows that modifications of standard existing POS devices were not required for use in the accused system. Binding precedent establishes that such evidence is insufficient." Docket No. 218 at 13.

The evidence AlexSam presented in this case is indistinguishable from the evidence the Federal Circuit has already deemed to be insufficient in *IDT*. Thus, even construing all facts in favor of AlexSam there is no possibility that AlexSam can carry its burden here to prove infringement.[2]

After conducting a *de novo* review of the briefing on both motions, the R&R, the claim construction briefing and order as well as the briefing on AlexSam's Objections, the Court agrees with the reasoning provided within the R&R and concludes that the Objections fail to show that the R&R was erroneous. Consequently, the Court **OVERRULES** AlexSam's Objections and **ADOPTS** the R&R as the opinion of the Court (Docket No. 218). It is therefore

**ORDERED** that the Non-Infringement Motion (Docket No. 111) is **GRANTED** and the Infringement Motion (Docket No. 117) is **DENIED**.

IT IS SO ORDERED.

**SIGNED this 16th day of March, 2022.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

[2] The Court also determines that AlexSam's waiver argument (Docket No. 221 at 1, n.1) is unavailing. Defendants' Motion for Summary Judgment of Non-Infringement properly raises Defendants' perception of the impact of *IDT* on this matter. Docket No. 111 at 6.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ALEXSAM, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:20-cv-00081-RWS-RSP |
| | § | |
| CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, and CIGNA HEALTHCARE OF TEXAS, INC., | § | |
| | § | |
| *Defendants*. | § | |

**FINAL JUDGMENT**

Pursuant to the Court's order dismissing the case, the Court hereby enters Final Judgment. Accordingly, it is

**ORDERED** that the above-captioned cause is **DISMISSED WITH PREJUDICE**. All motions by either party not previously ruled on are hereby **DENIED-AS-MOOT**.

The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

**SIGNED this 18th day of March, 2022.**

Robert W Schroeder III

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

US006000608A

# United States Patent [19]

Dorf

[11] Patent Number: 6,000,608

[45] Date of Patent: Dec. 14, 1999

[54] **MULTIFUNCTION CARD SYSTEM**

[76] Inventor: **Robert E. Dorf**, 904 Bromley Way, Raleigh, N.C. 27615

[21] Appl. No.: **08/891,261**

[22] Filed: **Jul. 10, 1997**

[51] **Int. Cl.**[6] .................................................. **G06K 5/00**

[52] **U.S. Cl.** ........................................ **235/380**; 235/375

[58] **Field of Search** .................................. 235/380, 375, 235/381, 382, 492, 493; 902/1, 2, 8, 10, 12, 22, 24, 25, 26, 27

[56] **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,491,725 | 1/1985 | Pritchard | 235/375 |
| 4,700,055 | 10/1987 | Kashkashian, Jr. | 235/379 |
| 4,731,818 | 3/1988 | Clark, Jr. et al. | 379/144 |
| 4,831,647 | 5/1989 | D'Avello et al. | 379/91 |
| 4,900,903 | 2/1990 | Wright et al. | 235/380 |
| 4,951,308 | 8/1990 | Bishop et al. | 379/91 |
| 4,963,722 | 10/1990 | Takeuchi | 235/382.5 |
| 4,990,904 | 2/1991 | Wright et al. | 235/381 |
| 5,101,098 | 3/1992 | Naito | 235/475 |
| 5,144,649 | 9/1992 | Zicker et al. | 379/59 |
| 5,146,067 | 9/1992 | Sloan et al. | 235/381 |
| 5,147,021 | 9/1992 | Maruyama et al. | 194/217 |
| 5,212,369 | 5/1993 | Karlisch et al. | 235/380 |
| 5,227,612 | 7/1993 | Le Roux | 235/379 |
| 5,243,174 | 9/1993 | Veeneman et al. | 235/381 |
| 5,264,689 | 11/1993 | Maes et al. | 235/492 |
| 5,310,997 | 5/1994 | Roach et al. | 235/375 |
| 5,352,876 | 10/1994 | Watanabe et al. | 235/381 |
| 5,409,092 | 4/1995 | Itako et al. | 194/210 |
| 5,440,108 | 8/1995 | Tran et al. | 235/381 |
| 5,450,938 | 9/1995 | Rademacher | 194/206 |
| 5,469,497 | 11/1995 | Pierce et al. | 379/115 |
| 5,491,326 | 2/1996 | Marceau et al. | 235/381 |
| 5,500,514 | 3/1996 | Veeneman et al. | 235/381 |
| 5,504,808 | 4/1996 | Hamrick, Jr. | 379/144 |
| 5,511,114 | 4/1996 | Stimson et al. | 379/114 |
| 5,513,117 | 4/1996 | Small | 364/479 |
| 5,524,073 | 6/1996 | Stambler | 380/24 |
| 5,530,232 | 6/1996 | Taylor | 235/380 |
| 5,542,081 | 7/1996 | Geronimi | 395/800 |
| 5,557,516 | 9/1996 | Hogan | 364/406 |
| 5,559,885 | 9/1996 | Drexler et al. | 380/23 |
| 5,563,934 | 10/1996 | Eda | 379/144 |
| 5,572,004 | 11/1996 | Raimann | 235/380 |
| 5,577,109 | 11/1996 | Stimson et al. | 379/112 |
| 5,578,808 | 11/1996 | Taylor | 235/380 |
| 5,621,787 | 4/1997 | McKoy et al. | 379/144 |
| 5,652,421 | 7/1997 | Veeneman et al. | 235/381 |
| 5,682,027 | 10/1997 | Bertina et al. | 235/380 |
| 5,815,561 | 9/1998 | Nguyen et al. | 379/115 |


*Primary Examiner*—Thien Minh Le
*Assistant Examiner*—Daniel Felten
*Attorney, Agent, or Firm*—Stroock & Stroock & Lavan LLP

[57] **ABSTRACT**

Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.

**66 Claims, 2 Drawing Sheets**



*FIG. 1*



103
Processing Hub
104
Prepaid Phone Card Issuer Hub
101
Intelligent Card™
106
Sponsor Bank Processor
102
108
Approved
Debit
Credit
Clear
Enter
1
2
3
4
5
6
7
8
9
*
0
#
POS Device


FIG. 2
Debit Network
107
Bank Processor
208
Sponsor Bank Processor
102
Processing Hub
103
Medical Info. Database
207
Loyalty Card Database
206
EGC Database
205
Prepaid Phone Card Issuer Hub 1
Phone Card Database
204
Prepaid Phone Card Issuer Hub 2
Phone Card Database
204
104
Retailer A Central Processor
201
Retailer C Central Processor
202
Bank Processor
209
Retailer E Central Processor
203
105
Approved
Intelligent Card™
101
106
A
B
C
D
E
F

# MULTIFUNCTION CARD SYSTEM

## FIELD OF THE INVENTION

The present invention relates generally to debit card systems, both bank-issued and non-bank-issued, and more particularly to a multifunction card system that can be accessed by a variety of standard point-of-sale devices, by phone, by fax, or over the Internet.

## BACKGROUND OF THE INVENTION

### I. Debit Cards

Banking institutions often issue debit cards to their customers to give them access to funds from their savings or checking accounts. Such a debit card might be an on-line debit card or an off-line debit card. On-line debit cards, often referred to as automatic teller machine (ATM) cards, require a personal identification number (PIN) to be entered into an ATM or point-of-sale (POS) device in order to authorize the transaction. Once completed, the transaction clears the bank account immediately. Off-line debit cards function like credit cards, and usually carry the VISA® or MasterCard® logo. A retailer processes the card like a credit card and the customer signs a receipt. The funds then clear the bank account in one to three days.

While such debit cards are extremely useful and provide convenience for bank depositors, they generally do not serve a plurality of functions. Therefore, there is a need in the art for a debit/credit card capable of performing a plurality of functions, such as an electronic gift certificate card, a prepaid phone card, and a loyalty card, all in a real-time secure environment. There is also a need in the art for a system which can provide a card substitute for travelers checks and money orders which can be accepted by any POS device or ATM for financial transactions. Further, there is a need for a processing center which can manage such a multifunction card system.

### II. Prepaid Phone Cards

Prepaid card systems are used by the telephone industry to allow customers to prepurchase long distance calling time. Such cards are typically purchased in predefined value increments. The card provides the customer with an amount of long distance calling time equivalent to the predefined value increment.

Each of the cards has an identification number printed or magnetically stored on it. The identification number is also stored in a record in a database maintained by the card issuer. This record also stores the predefined value of the card. When the cards are sent to the retail location from which they will be sold, the corresponding records in the database are activated, thus allowing the card to be used immediately by a customer. To use the card, the customer dials a toll free number to access the card issuer's system, enters the identification number, and then makes the desired long-distance call. During the call, the value of the card in the database is decremented accordingly. When the value of the card is exhausted, the call terminates. If the customer ends the call before the value of the card is exhausted, the remaining value may be used for additional calls. Once the entire value of the card has been used, it is discarded.

These prior art prepaid phone card systems have several disadvantages. First, since the cards are active while on the shelf in the retail location, they may be stolen by a thief and easily used. Second, the prior art systems do not allow the customer to purchase a card having any given value, nor do they allow the customer to recharge the value of the cards once the are depleted.

One way to address some of the drawbacks of prior art prepaid phone card systems would be to install activation terminals unique to the prepaid card issuer. This is referred to as a "closed system." U.S. Pat. No. 5,577,109 to Stimson et al. discloses such a closed system. In the Stimson system, the cards are not preactivated. Each of the retail locations from which cards are to be sold is provided with a dedicated activation terminal which allows the retail operator to set the value of the card at the time of the sale. The activation terminal connects to the card issuer's system to pass along the value amount and to request activation of the card. Depleted cards can be recharged in the same manner as they are sold. A serious disadvantage of the Stimson system is that it requires single-function dedicated hardware to be installed in each retail location, resulting in a very inflexible and expensive system.

Thus, there is a need in the art for a prepaid phone card activating system which is easily and inexpensively deployed, and which allows cards to be purchased in varying amounts and to be recharged without requiring the use of a closed system to handle the transactions.

### III. Loyalty Cards

Loyalty cards are used to reward consumers for purchasing goods or services. For instance, airlines commonly reward frequent fliers with points for each mile flown with that airline. When the consumer accumulates a certain number of points, he or she is rewarded with free or discounted air fare. In this and other similar systems, the loyalty card issuer directly participates in the sale transaction. Such systems, however, do not allow a manufacturer of a product which is sold by an unrelated retailer to immediately reward the ultimate purchaser of the product with loyalty points. Since the manufacturer does not know of the ultimate sale until much later, if ever, it is difficult for such a manufacturer to conduct a loyalty program. Thus, there is presently no method for creating a product-specific loyalty card as opposed to a retailer-specific card. Nor is there a system for communicating loyalty data to databases not located at the retail establishment.

Furthermore, prior art loyalty programs generally do not credit the consumer's loyalty account in real-time as a purchase transaction takes place. Therefore, the consumer is unable to enjoy the benefits of their added loyalty points immediately. Finally, prior art loyalty programs commonly require significant startup efforts and expenses before the system is operational. Therefore, there is a need in the art for a real-time loyalty card system which is easily deployed, and which is capable of providing a product-specific loyalty card as well as a retailer-specific card. There is also a need for a system which can reward customers automatically for their loyalty and communicate this loyalty reward to databases other than at a retail location.

### IV. Information Retrieval

Often, it is important to access certain types of information in a very fast and convenient manner. For example, a person's medical history can be extremely important in assessing the propriety of certain medical procedures during a medical emergency. Presently, in order to obtain a patient's medical history, the patient or his or her doctor must request the appropriate files from the patient's previous doctor(s). It often takes a number of days to receive the requested information. In a medical emergency, this delay is often far too long. Thus, there is a need for patients to have control over their own medical history data. Further, there is a need for this data to be instantly available to the patient, or the patient's doctor if the patient is incapacitated.

### V. Multifunction Card

Due to the proliferation of various types of cards (e.g., credit/debit, long-distance calling, loyalty, etc.) over the last

couple of decades, it has become increasingly difficult to keep track of each individual card. There is a need for a card system which can serve a number of functions, thus allowing the consumer to have one card which may act as their card for financial transactions, long-distance telephone calls, loyalty information, and medical information.

## SUMMARY OF THE INVENTION

The present invention solves the problems associated with prior art card systems by providing an improved multifunction card system. The multifunction card system comprises at least one electronic gift certificate card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving electronic gift certificate card activation data from an existing standard retail point-of-sale device when the electronic gift certificate card is swiped through the point-of-sale device, the electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate activation amount; means for activating an account corresponding to the electronic gift certificate card with a value equal to the electronic gift certificate card activation amount; and means for allowing a user of the electronic gift certificate card to purchase goods having a value up to the electronic gift certificate activation amount.

The multifunction card system further comprises at least one phone card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving phone card activation data from an existing standard retail point-of-sale device when the phone card is swiped through the point-of-sale device, the phone card activation data comprising the unique identification number of the phone card and a phone card activation amount; means for activating an account corresponding to the phone card with a value equal to the phone card activation amount; and means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the phone card activation amount.

In a preferred embodiment, the multifunction card system further comprises at least one loyalty card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving loyalty data from an existing standard retail point-of-sale device when the loyalty card is swiped through the point-of-sale device, the loyalty data comprising the unique identification number of the loyalty card and a purchase amount; and means for crediting an account corresponding to the loyalty card with a number of loyalty points proportional to the purchase amount.

Optionally, the multifunction card system of the present invention may also comprise at least one medical information card having a unique identification number associated with it, the medical information card belonging to a patient; a database comprising at least one record corresponding to the medical information card, the record containing medical history information about the patient; and means for allowing an authorized requester to obtain the medical history information about the patient using the unique identification number associated with the medical information card.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be more fully understood by reference to the following detailed description when considered in conjunction with the following drawings wherein like reference numbers denote the same or similar portions or processes shown throughout the several Figures, in which:

FIG. **1** is a block diagram of the multifunction card system of the present invention; and

FIG. **2** is block diagram demonstrating the various ways in which a retail point-of-sale device might connect to the multifunction card system of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is a multifunction card system which allows for the activation of prepaid phone cards and the use of Electronic Gift Certificate™ cards, loyalty cards, debit cards, and medical information cards. Further, the system provides for the immediate linkage of these various functions. FIG. **1** illustrates the multifunction card system **108** of the present invention. The system **108** comprises a plurality of cards **101**, a sponsor bank processor **102**, and a processing hub **103**, which serves as the nerve center of the system **108**. If the system **108** is to provide prepaid phone cards, it will also include a prepaid phone card issuer hub **104** maintained by a prepaid phone card issuer. In order to achieve the desired functionality, the system **108** uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices **105**. These devices **105** include stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry.

To access these POS devices, the operator of the system **108** must apply for and obtain a Bank Identification Number (BIN) from the American Banking Association. The BIN serves as a unique identifier of the multifunction card system **108** within the banking network. The BIN is encoded on a magnetic strip **106** on each card **101** in the system **108** as a part of the card's identification number. Alternatively or additionally, the BIN and identification number could be encoded as a bar code, embossed on the surface on the card **101** in numerals for manual entry, or provided by any other means known in the art.

Preferably, the BIN's first digit will be the same number as the first BIN digit used by a popular card issuer. This is because POS devices are preprogrammed to recognize only certain types of cards, such as those issued by VISA® and MasterCard®, American Express®, etc. As a rule, these POS devices must be reprogrammed before they will accept a new type of card. However, since POS devices already recognize cards issued by these popular card issuers, a new type of card will also be recognized by such devices if it has a BIN that begins with the same number used by one of the popular card issuers. Since VISA® and MasterCard® are the most universally accepted cards, the BIN of the multifunction card system **108** of the present invention preferably will begin with the same number used by either VISA® or MasterCard® (i.e., "4" or "5", respectively). By using one of these numbers, the card **101** will be recognized by almost all existing POS devices **105** as a debit or credit card, and its transactions will be automatically routed by the banking system to the correct destination. This occurs regardless of the type of POS device **105** used, since all such devices are designed to interface with the banking network. Although

the BIN number will preferably begin with a "4" or "5", it may begin with any number that is recognized by POS devices **105**.

The operator of the system **108** should also have a sponsoring bank whose bank processor **102** will serve as the link between the processing hub **103** and the banking network. Alternatively, the operator of the system **108** could itself be a banking institution.

By providing a means for any given POS device **105** to connect to the processing hub **103**, the system **108** allows a retailer to remotely activate or add value or loyalty data to a system card. The method by which this occurs is set forth more fully below in the context of the various functions of the card.

I. Prepaid Phone Card

A plurality of long distance service providers may contract with the operator of the multifunction card system **108** to issue prepaid phone cards **101** for use in the system **108**. Alternatively, a long distance service provider may itself be the operator of the system **108**. The long distance service provider will be referred to as a phone card issuer. A phone card issuer provides prepaid phone cards **101** to retailers who sell the cards **101** at their retail locations. Until activated, the cards **101** have no intrinsic value associated with them. Therefore, they may be placed on store shelves in easily accessible areas without the fear of losses due to theft. When a customer wishes to purchase or recharge one of the cards **101**, he or she informs the sales clerk of the monetary amount desired. Depending upon the system chosen by the particular phone card issuer, this amount may be one of a finite number of predefined amount increments, or may be selected by the customer. The clerk swipes the card **101** through the POS device **105**. Depending upon the amount of customization that has occurred at the retailer's location, there are a number of ways in which the POS device **105** may connect to the system's **108** processing hub **103** to carry out the transaction. FIG. **2** illustrates several of these methods.

The first two methods shown in FIG. **2**, methods A and B, are the most easily deployed, but cost the most on a per-transaction basis. To route information to the processing hub **103**, these methods employ the debit network **107** used by banking institutions. The retailer in method A (retailer A) has a central processor which controls each of its POS devices **105** and connects them to a processor **208** at a bank chosen by the retailer. Retailer B's POS device **105** connects directly to the bank processor **208**. Otherwise, the two methods are the same.

Banking regulations currently require that any transaction taking place over the debit network **107** must result in an actual transfer of funds. Since this phone card activation transaction is not a typical debit transaction, it is presently desirable to keep the official amount of the transaction to a minimum, yet still comply with the banking regulations. Therefore, regardless of the actual sale amount, the clerk enters a nominal transaction amount. In a preferred embodiment, the nominal transaction amount is keyed to the actual transaction amount (e.g., $0.01 nominal=$10.00 actual, $0.02 nominal=$20.00 actual, etc.). Therefore, the actual transaction amount can be ascertained from the nominal amount. In this embodiment, the card could only be activated or recharged in predefined increments. If the card is to have a fixed value, the activation amount could also be encoded on the magnetic strip **106** of the card **101** as part of the card's identification number.

In an alternate embodiment, the card could be activated or recharged in any amount desired by the customer. In this case, the nominal transaction amount would be a fixed value, such as $0.01. Once the nominal transaction amount is entered, the actual sale amount could then be entered on the PIN pad of the POS device **105** instead of the personal identification number (PIN) that would normally be entered when using a debit card. By entering the actual sale amount in this manner, it can be any desired amount.

In either case, before it transmits the data, the POS device **105** encrypts the information to be sent. This information includes the identification number read from the card's magnetic strip **106**, the nominal transaction amount, and the actual sale amount if it was entered into the PIN pad. The system **108** contains software which will decrypt and translate the data upon receipt. Once the encryption has taken place, the POS device **105** transmits the data either directly or via the central processor **201** to the bank processor **208**. The bank processor **208** receives the data and transmits it over the debit network **107**. The debit network **107** then forwards the data to the sponsoring bank's processor **102**. As mentioned earlier, the sponsoring bank is one which has agreed to operate as a link between the debit network **107** and the processing hub **103**.

As mentioned earlier, banking regulations as they currently exist require that transactions taking place over the debit network must result in a transfer of funds. Preferably, in order to comply with the banking regulations, the sponsoring bank transfers the nominal amount (e.g., $0.01) from one account belonging to the retailer to another account also belonging to the retailer. The bank processor **102** then forwards the data from the POS device **105** to the processing hub **103**.

In methods C and D, the retailers' central processor **202** or POS device **105**, respectively, again connect to a processor **209** at a retailer-chosen bank. By agreement between the operator of the multifunction card system **108** and the retailer-chosen bank, this bank processor **209** is programmed to recognize the multifunction card system's BIN and to forward the system's transactions directly to the sponsoring bank's processor **102** rather than using the debit network **107**. Since the debit network **107** is not used, it is not necessary to use a nominal sale amount, although such a method would nonetheless work and might be preferred by the retailer for security and bookkeeping purposes. The system **108** could instead be programmed to prompt the clerk for the appropriate information. As in methods A and B, the sponsor bank processor **102** forwards the necessary information to the processing hub **103**. Although methods C and D are more efficient than methods A and B on a per transaction basis, they require some customization at the retailer location to cause the retailer to connect to a bank processor **209** that recognizes the system's BIN.

Methods E and F are the least costly methods of connecting to the processing hub **103** (i.e., directly from the retailer's central processor **203** or from the POS device **105** itself). The connection may be made via a toll-free telephone line, a dedicated phone line, over the Internet, or any other standard communication means. Again, however, these methods require the most customization at the retailer location to cause the retailer's system to recognize the multifunction card system's cards and to route their transactions directly to the processing hub **103**. Such customization, however, still does not require reprogramming of the POS devices themselves. The connection method chosen may be adjusted to fit the individual retailer's needs.

Regardless of the method used, the data will eventually arrive at the processing hub **103**. If the transmission has taken place over the debit network **107**, the data must be

decrypted using equipment well known in the art for decrypting debit transaction data. Once the data is received and, if necessary, decrypted, the processing hub **103** recognizes the identification number of the card as being associated with a particular prepaid phone card issuer. Next, a security check is performed to verify that this transaction is originating from a retailer that is authorized to sell the prepaid phone cards. If the transaction is originating from an authorized retailer, the transaction will proceed. The processing hub **103** will then forward the card identification number, retail store and POS device information, and amount information to the issuer hub **104** maintained by the prepaid phone card issuer. The issuer hub **104** contains one or more phone card databases **204** which store information about each phone card. When the issuer hub **104** receives the data from the processing hub **103**, it activates the record in the phone card database **204** having the same identification number as the card **101**. The value field in the record is then increased by the appropriate purchased amount. If the card is of a fixed value, the record is simply activated. The issuer hub **104** then returns an authorization number which travels back along the same path to the originating POS device **105**. The customer may then dial the prepaid phone card issuer's toll free number, enter the card number and any required PIN, and obtain long distance calling time having a value up to the value of the card stored in the phone card database **204**.

Each activation or recharge transaction is recorded by the system **108**. At the end of the day, a report is preferably created for each card issuer and retail location so that their accounts can be reconciled. Transfer of funds between these parties may then take place by any commercially acceptable means.

II. Electronic Gift Certificate™ Card

The multifunction card system **108** of the present invention is also capable of providing an Electronic Gift Certificate™ (EGC) card **101** for a retail issuer. Such a card **101** could be sold by the retail issuer for making purchases only in the retail issuer's stores or for use in a plurality of stores. As in the phone card context, the customer would ask the sales clerk for an Electronic Gift Certificate™ card of the desired amount. If the customer already has an Electronic Gift Certificate™ card, he or she might ask the clerk to add the desired amount to the already existing balance. The clerk swipes the card **101** and enters the transaction amount, either directly or using a nominal amount and/or the PIN pad, depending upon whether the debit network **107** is to be used. Using one of the methods discussed above, the data then makes its way to the processing hub **103**.

Alternatively, the activation could occur by processing the card **101** as a typical debit card using the debit network **107**. In such a case, the retail issuer would maintain accounts with the sponsor bank. When an activation transaction takes place, the bank would transfer the activation amount from a general account to an account corresponding to the card. If the card is to be accepted at a number of retail locations, the account corresponding to the card could be opened in the name of the card holder if appropriate paperwork is submitted to the bank. In this manner, the card could be used at any retail location capable of processing debit transactions. This would allow the card to serve as a prepaid card substitute for travelers checks and money orders. Regardless of the way in which the card is processed, the transaction data eventually makes its way to the processing hub **103**.

Upon receipt of the transaction data, the hub **103** recognizes the card **101** as being an Electronic Gift Certificate™ card of the retail issuer and activates or recharges the card **101** in the appropriate amount in an EGC database **205** maintained at the processing hub **103**.

Optionally, the Electronic Gift Certificate™ card **101** could also be recharged using a credit card via an on-line connection to the processing hub **103**, such as over the Internet.

Once a card **101** has been activated or recharged, the recipient of the card **101** is allowed to make purchases using the card. If the card is only for use in the retail issuer's stores, the purchase transaction might proceed in much the same manner as the activation process. The clerk would swipe the card **101** and enter the purchase amount. If the transaction is to be transmitted over the debit network, a nominal transaction amount may be used, and the actual amount entered instead of the PIN. A special code is used to indicate that the transaction is a purchase transaction rather than an activation or recharge transaction. If the debit network is used, the code could be the first digit of the PIN, followed by the purchase amount, thus allowing the software of the system **108** to recognize the type of transaction and decrypt the data accordingly.

Upon receipt of the data via one of the methods described above, the processing hub **103** compares the purchase amount to the balance for the card in the EGC database **205**. If the balance is greater than the purchase amount, the processing hub **103** will decrement the record in the database and will send back an approval code which will allow the transaction to proceed. If a sufficient balance is not present, the processing hub **103** will notify the POS device **105** that the transaction may not proceed. Preferably, an automated toll free number is provided for the holder of the card **101** to verify the remaining balance. The processing hub **103** preferably maintains records of all transactions.

If the card **101** is for use in many retail locations, it would instead be processed during purchase transactions as a typical debit card, preferably using the debit network **107**. In this case, either the retail issuer or the cardholder must have an account with the sponsor bank. When a purchase transaction takes place, the clerk or cardholder simply swipes the card and receives back a response in the same manner as a normal debit transaction. If sufficient funds are present in the account corresponding to the card, the transaction will be approved. The sponsor bank then transfers the purchase amount from the retail issuer's or cardholder's account to an account belonging to the retail location at which the purchase occurred, which account may or may not be located at the sponsor bank. The transaction data is then forwarded to the processing hub **103** so that the EGC database **205** can be updated.

In a preferred embodiment, an Electronic Gift Certificate™ card could also be used to obtain long distance calling time in addition to making purchases in the retail issuer's store. The retail issuer could contract with a prepaid phone card issuer to provide the calling time. When the card **101** is activated, the phone card issuer simultaneously creates an entry in its phone card database **204** corresponding to the entry in the EGC database **205**. The card **101** can then be used in exactly the same manner as the prepaid phone card discussed above. In order to prevent the use of the Electronic Gift Certificate™ card simultaneously to make purchases and to obtain long distance calling time, a safety procedure is provided. When the card **101** is used to make a long distance call, the phone card issuer hub **104** instructs the processing hub **103** to seize the record corresponding to the card **101** in the EGC database **205**. With the record seized, the system **108** will not authorize any purchasing activity for the duration of the call. When the call terminates, the phone

card issuer hub **104** decrements the appropriate record in its phone card database **204** and instructs the processing hub **103** to do the same in the EGC database **205**. The record in the EGC database **205** is then unseized. When the card **101** is used to make a purchase, the processing hub **103** similarly instructs the phone card issuer hub **104** to seize the appropriate record in the phone card database **204** for the duration of the transaction. When the transaction is over, the records in the EGC database **205** and the phone card database **204** are decremented appropriately.

In the preferred embodiment of the invention, the retail issuer is also given the capability to award loyalty points to the bearer of the Electronic Gift Certificate™ card in recognition of purchases or recharges made. In such a case, the processing hub **103** maintains a separate loyalty card database **206**. When the Electronic Gift Certificate™ card bearer adds money to the card **101**, or makes a purchase using the card **101**, the system **108** may add a number of points proportional to the purchase price to the card's record in the loyalty card database **206**. Alternatively points could be awarded based upon the frequency of card usage rather than purchase amounts. In either case, when the card bearer reaches certain predefined point plateaus, he or she may be rewarded by the retail issuer with additional card value or with long-distance calling time.

III. Loyalty Card

Not unlike the loyalty feature add-on of the Electronic Gift Certificate™ card, the system **108** of the present invention may provide a separate loyalty card much like a frequent flier card that can have points added at virtually any POS device **105**.

A. Product/Manufacturer-Specific Loyalty Card

The card could be issued by a certain manufacturer to reward a customer with loyalty points for purchasing the manufacturer's product, regardless of the retail location of the purchase. This reward could be tied to the purchase of a single product type or to all of the manufacturer's products. The loyalty points awarded could be varied based upon any promotional campaigns being conducted by the manufacturer. Points are added to the card at participating retail locations which sell the manufacturer's product(s). The card **101** is swiped at any retail location, the purchase amount for the manufacturer's product is entered using the PIN pad of the POS device **105**, and the data is transmitted to the processing hub **103** using one of the methods described above. After receiving the data, the processing hub **103** credits the appropriate record in the loyalty card database **206** with a number of points proportional to the purchase price. The card is transportable to any participating retailer. The system **108** allows the manufacturer to connect to the processing hub **103** via an on-line connection to access the loyalty card database **206**. Again, the customer could be rewarded when certain point plateaus are reached.

B. Retailer-Specific Loyalty Card

Alternatively, the card could be issued by a particular retailer to reward customers for purchases made in the retailer's location(s). The retailer could award points for any purchase within the store, or could target special promotional items. The card would function in a manner similar to the product-specific card. Once again, the customer is rewarded when certain point plateaus are reached.

Alternatively, the loyalty data could be used to simultaneously credit other databases of the system **108**. For instance, instead of awarding loyalty points, the system could add value in real time to a record in the phone database **204** at the prepaid phone card issuer hub **104**, thus rewarding the customer with free phone time. Loyalty points might also be converted into a dollar value for use at the retail location. Optionally, the system **108** can keep records of a consumer's purchasing habits for marketing purposes. As with the manufacturer-specific card, the system **108** allows the retailer to connect to the processing hub **103** via an on-line connection to access the loyalty card database **206**.

IV. Information Retrieval Card

Finally, the multifunction card system **108** of the present invention is capable of providing an information retrieval card. In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided. Each participating patient's medical information is stored in a record in a medical information database **207** maintained at the processing hub **103**. The record contains the identification number encoded on the patient's card **101**.

When medical history information data is needed, it may be requested by swiping the card **101** through a POS device **105** at a participating doctor's office or hospital. Preferably, a PIN is entered into the POS device **105** to ensure that only an authorized person is able to request the information. The POS device **105** would then send the request to the processing hub **103** via one of the routes described above. When the processing hub **103** receives the request from the authorized requester, it then immediately sends the information to the requestor via means preselected by the participating doctor's office or hospital. Such means may include electronic mail, facsimile, voice response, and other similar means. The medical history information may be updated by the patient or his or her doctor or insurer by forwarding new information to the operator of the system **108** via an on-line connection, over the Internet, by telephone, by facsimile, or by mail.

As a backup, the request could instead be made using a computer, wherein the computer connects to the processing hub **103** via the Internet or by direct modem connection. The requestor might be allowed to view, print, or download the appropriate medical history information. Alternatively, the request could be made by facsimile or by calling an automated toll free number and entering the card number.

In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system **108** also allows access to a database which maintains the medical funds for the cardholder. As described above under the Electronic Gift Certificate™ section, the system **108** is able to authorize, reject, and cause money to be transferred based upon the cardholder's available medical funds.

V. Intelligent Card™

In the preferred embodiment of the invention, the multifunction card system **108** is capable of providing a single card **101** which is capable of performing all of the foregoing functions. Preferably, the system **108** also allows for the card **101** to be used as an on-line debit card after the cardholder registers with the system. In order to let the system **108** know which function or functions the card **101** is serving in any particular transaction, a code is entered into the PIN pad of the POS device from which the transaction is originating. Alternatively, the system **108** could prompt the user to indicate the proper card function and the databases that must be accessed. Based upon this input, the system **108** carries out the appropriate actions. The system **108** can access each of the databases discussed above and can simultaneously increase or decrease each database as needed by the type of transaction occurring.

VI. Processing Hub Technical Details

The processing hub **103** of the present invention provides front-end POS device management and message processing

for card authorization and activations. The processing hub **103** can be implemented using any computer having acceptable processing and storage capacity. It preferably comprises a Stratus RADIO Cluster™, which is a scaleable system based upon the standard Intel Pentium processor. The Stratus RADIO Cluster™ provides the processing hub **103** with a high degree of reliability and fault-tolerance. Since the Stratus system is scaleable, an adequate degree of redundancy can be provided in order to reduce the impact of individual failures. In addition, as demand for the multifunction card system increases, the processing hub **103** can be scaled to meet increasing demands for processing power and storage availability. The modular design of such a hub is upgradable for long term capacity planning and expansion.

The software of the system is preferably written in the C, Force, and Foxpro programming languages. The C language programs are preferably written to interface with specialty external interface boards. Force is preferably used for all on-line transaction processing, while Foxpro preferably provides for database management and the user interface. Since Force and Foxpro share database file structures, on-line transactions may be viewed by the system operators using the Foxpro interface.

In order to provide further reliability, all applications and data are replicated and synchronized across the processing hub **103** by Isis Reliable software. Load distribution among the modules is automatically controlled by the software to improve the response time and throughput. External communications nodes provide the necessary interface requirements of physical connectivity, protocol, message transmission, message validation, and message processing.

While the multifunction card system herein described constitutes the preferred embodiment of the present invention, it is to be understood that the invention is not limited to this precise form of system, and that changes may be made therein without departing from the scope of the invention which is defined in the following claims.

I claim:

**1**. A multifunction card system, comprising:

a. at least one electronic gift certificate card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving electronic gift certificate card activation data from an unmodified existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device, said electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate activation amount;

c. means for activating an account corresponding to the electronic gift certificate card with a balance equal to the electronic gift certificate activation amount;

d. means for allowing a user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card; and

e. means for decreasing the balance of the account corresponding to the electronic gift certificate card by the value of the goods and services purchased.

**2**. A multifunction card system as recited in claim **1**, further comprising:

a. means for receiving electronic gift certificate card recharge data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device, said electronic gift certificate card recharge data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate recharge amount; and

b. means for increasing the balance of the account corresponding to the electronic gift certificate card by the electronic gift certificate recharge amount.

**3**. A multifunction card system as recited in claim **1**, wherein the first digit of said bank identification number is selected from the group consisting of four and five.

**4**. A multifunction card system as recited in claim **1**, further comprising means for allowing a user of the electronic gift certificate card to obtain long distance telephone calling time, wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained cannot exceed the balance of the account corresponding to the electronic gift certificate card.

**5**. A multifunction card system as recited in claim **4**, wherein said means for receiving electronic gift certificate activation data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device employs the banking network.

**6**. A multifunction card system as recited in claim **4**, further comprising means for associating loyalty data with the electronic gift certificate card based upon usage of the electronic gift certificate card.

**7**. A multifunction card system as recited in claim **1**, further comprising means for associating loyalty data with the electronic gift certificate card based upon usage of the electronic gift certificate card.

**8**. A multifunction card system as recited in claim **1**, wherein said means for receiving electronic gift certificate activation data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device employs the banking network.

**9**. A multifunction card system as recited in claim **1**, further comprising:

a. at least one phone card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card activation data comprising the unique identification number of the phone card and a phone card activation amount;

c. means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount;

d. means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the balance of the account corresponding to the phone card; and

e. means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained.

**10**. A multifunction card system as recited in claim **9**, further comprising:

a. means for receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card recharge data comprising the unique identification number of the phone card and a phone card recharge amount; and

b. means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount.

**11**. A multifunction card system as recited in claim **9**, wherein a single card with a single identification number can function as an electronic gift certificate card and as a phone card.

**12**. A multifunction card system as recited in claim **1**, further comprising:

a. at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the loyalty card and purchase data; and

c. means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**13**. A multifunction card system as recited in claim **12**, wherein a single card with a single identification number can function as an electronic gift certificate card and as a loyalty card.

**14**. A multifunction card system as recited in claim **1**, further comprising:

a. at least one medical information card having a unique identification number associated with it, said medical information card belonging to a patient;

b. a database comprising at least one record corresponding to said medical information card, said record containing medical history information about the patient; and

c. means for allowing an authorized requester to obtain the medical history information about the patient using the unique identification number associated with the medical information card.

**15**. A multifunction card system as recited in claim **14**, wherein a single card with a single identification number can function as an electronic gift certificate card and as a medical information card.

**16**. A prepaid phone card system, comprising:

a. at least one phone card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the prepaid phone card system;

b. means for receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card activation data comprising the unique identification number of the phone card and a phone card activation amount;

c. means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount;

d. means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the balance of the account corresponding to the phone card; and

e. means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained.

**17**. A prepaid card system as recited in claim **16**, further comprising:

a. means for receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card recharge data comprising the unique identification number of the phone card and a phone card recharge amount; and

b. means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount.

**18**. A prepaid phone card system as recited in claim **16**, wherein the first digit of said bank identification number is selected from group of numbers consisting of the numbers four and five.

**19**. A prepaid card system as recited in claim **16**, wherein said means for receiving phone card activation data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device employs the banking network.

**20**. A loyalty card system, comprising:

a. at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the loyalty card system;

b. means for receiving loyalty data from an unmodified existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the card and purchase data; and

c. means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**21**. A loyalty card system as recited in claim **20**, wherein the first digit of said bank identification number is selected from a group of numbers consisting of the numbers four and five.

**22**. A loyalty card system as recited in claim **20**, wherein said means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device employs the banking network.

**23**. A method of activating or recharging a prepaid card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a prepaid card system, comprising the steps of:

a. swiping the card through an unmodified existing standard retail point-of-sale device;

b. entering an amount into the point-of-sale device;

c. transmitting the identification number and the amount from the point-of-sale device to a processing hub;

d. crediting an account balance in a database with the amount;

e. allowing a user of the card to purchase goods and services using the card; and

f. allowing a user of the card to obtain long distance telephone calling time using the card;

g. wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained using the card cannot exceed the account balance.

**24**. A method according to claim **23**, further comprising the step of associating loyalty data with the card based upon usage of the card.

**25**. A method according to claim **24**, further comprising the step of transferring loyalty data to a phone card issuer.

**26**. A method according to claim **23**, wherein said step of transmitting the identification number and the amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**27**. A method of activating or recharging a prepaid phone card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a prepaid phone card system, comprising the steps of:

a. swiping the phone card through an unmodified existing standard retail point-of-sale device;

b. entering an amount into the point-of-sale device;

c. transmitting the identification number and the amount from the point-of-sale device to a processing hub;

d. transmitting the identification number and the amount from the processing hub to a prepaid phone card issuer hub;

e. crediting an account balance in a phone card database with the amount; and

f. allowing a user of the phone card to obtain long distance telephone calling time having a value up to the account balance.

**28**. A method according to claim **27**, wherein said step of transmitting the identification number and the amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**29**. A method of adding points to a loyalty card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a loyalty card system, comprising the steps of:

a. swiping the loyalty card through an unmodified existing standard retail point-of-sale device;

b. entering purchase data into the point-of-sale device;

c. transmitting the identification number and the purchase data from the point-of sale device to a processing hub; and

d. crediting an account in a database with loyalty points based upon the purchase data.

**30**. A method according to claim **29**, wherein said step of transmitting the identification number and the purchase amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**31**. A method according to claim **29**, further comprising the step of allowing the owner of the loyalty card to redeem loyalty points for an item selected from the group consisting of goods, services, discounts on goods and services, long distance telephone calling time value, and money value.

**32**. A multifunction card system comprising:

a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

c. a processing hub receiving directly or indirectly said card data from said transaction processor; and

d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

**33**. The multifunction card system of claim **32**, wherein the unique identification number further comprises a medical identification number.

**34**. A system comprising:

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

**35**. The system of claim **34**, wherein the electronic gift certificate card activation amount is encoded in the unique identification number.

**36**. The system of claim **34**, wherein the electronic gift certificate card activation amount is entered at the point-of-sale device.

**37**. The system of claim **34**, wherein said processing hub allows a user of the electronic gift certificate card to purchase a value up to the balance corresponding to the electronic gift certificate activation amount.

**38**. The system of claim **34**, wherein:

a. said transaction processor receives electronic gift certificate card recharge data from the existing standard retail point-of-sale device, said electronic gift certificate card recharge data including said unique identification number and an electronic gift certificate card recharge amount; and

b. said processing hub increasing said amount corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate card recharge amount.

**39**. The system of claim **34**, wherein the first digit of the bank identification number is selected from a group of numbers consisting of the numbers four and five.

**40**. The system of claim **34**, wherein the processing hub allows the use of the electronic gift certificate card to obtain phone calling time.

**41**. The system of claim **34**, further comprising:

a. a prepaid phone card issuer hub receiving directly or indirectly the electronic gift card activation data from said processing hub; and

b. said prepaid phone card issuer hub activating a record in a phone card database corresponding to the electronic gift certificate card unique identification number.

**42**. The system of claim **41**, wherein the prepaid phone card issuer hub instructs the processing hub to seize the account corresponding to the electronic gift certificate card unique identification number where an electronic gift certificate card is used to make a call.

**43**. The system of claim **41**, wherein the processing hub instructs the phone card issuer hub to seize the record corresponding to the electronic gift certificate card unique identification number when the electronic gift certificate card is used to make a transaction.

**44**. The system of claim **34**, wherein the transaction processor is coupled to the banking network.

**45**. The system of claim **34**, wherein the processing hub associates loyalty data with the electronic gift certificate card based upon the usage of the electronic gift certificate card.

**46**. The system of claim **34**, wherein the activation data received at the processing hub is encrypted.

**47**. The system of claim **34**, wherein the processing hub includes a loyalty card database.

**48**. The system of claim **34**, wherein the processing hub includes a medical information card database.

**49**. The system of claim **34**, wherein the processing hub includes an electronic gift certificate card database, a loyalty card database, and a medical information database.

**50**. A multifunction card system comprising:

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including the electronic gift certificate card unique identification number and an electronic gift certificate card activation amount;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

**51**. The multifunction card system of claim **50**, wherein the electronic gift certificate card activation amount is encoded in the unique identification number.

**52**. The multifunction card system of claim **50**, wherein the electronic gift certificate card activation amount is entered at the point-of-sale device.

**53**. The multifunction card system of claim **50**, further comprising:

a. at least one phone card having a phone card unique identification number encoded on it, said phone card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. said transaction processor receiving phone card activation data from said existing standard retail point-of-sale device, said phone card activation data including said phone card unique identification number and a phone card activation amount;

c. said processing hub receiving directly or indirectly said phone card activation data from said transaction processor and recognizing the phone card unique identification number of the phone card as being associated with a particular prepaid phone card issuer; and

d. said processing hub forwarding the phone card activation data to a particular prepaid phone card issuer hub.

**54**. The multifunction system of claim **53**, wherein the particular prepaid phone card issuer hub contains at least one phone card database which stores information about each said phone card and activates the stored information to permit debiting of a predetermined value of phone calling in response to the activation data.

**55**. The multifunction system of claim **50**, further comprising:

a. at least one loyalty card having a loyalty card unique identification number encoded on it, said loyalty card identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. said transaction processor receiving loyalty card activation data from said existing standard retail point-of-sale device, said loyalty card activation data including said loyalty card unique identification number and purchase data;

c. said processing hub receiving directly or indirectly said phone card activation data from said transaction processor; and

d. said processing hub crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**56**. The multifunction system of claim **50**, further comprising:

a. at least one medical information card having a medical card unique identification number associated with it, said medical information belonging to a patient; and

b. said processing hub including at least one record corresponding to said medical information card, said record containing medical history information about the patient.

**57**. A multifunction card system comprising:

a. at least one card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving card activation data from an unmodified existing standard retail point-of-sale device, said card activation data including said unique identification number;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the unique identification number, thereby permitting later access to said account.

**58**. The multifunction card system of claim **57**, wherein said card is selected from the group consisting of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card.

**59**. The multifunction card system of claim **57**, wherein said card performs the functions of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card.

**60**. A method of activating a prepaid card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, the method comprising the steps of:

a. swiping the card through an unmodified existing standard point-of-sale device;

b. transmitting the identification number and an activation amount from the point-of-sale device to a processing hub; and

c. activating an account in the processing hub corresponding to the identification number.

**61**. The method of claim **60**, further comprising:

a. transmitting the identification number and a recharge amount from the point-of-sale device to a processing hub; and

b. recharging the account in the processing hub corresponding to the identification number.

**62**. The method of claim **60**, further comprising entering the activation amount into the point-of-sale device.

**63**. The method of claim **60**, wherein the step of transmitting the identification number and the activation amount from the point-of-sale device is carried out at least in part over the banking network.

**64**. The method of claim **60**, further comprising allowing a user of the card to obtain calling time using the card.

**65**. The method of claim **60**, further comprising allowing a user of the card to purchase goods and services using the card.

**66**. The method of claim **60**, further comprising associating loyalty data with the card based upon usage of the card.

* * * * *

US006000608C1

# (12) EX PARTE REEXAMINATION CERTIFICATE (9123rd)

# United States Patent

**Dorf**

(10) **Number: US 6,000,608 C1**

(45) **Certificate Issued: Jul. 10, 2012**

(54) **MULTIFUNCTION CARD SYSTEM**

(75) Inventor: **Robert E. Dorf**, Raleigh, NC (US)

(73) Assignee: **AlexSam, Inc.**

**Reexamination Request:**
No. 90/009,793, Aug. 2, 2010

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,000,608** |
| Issued: | **Dec. 14, 1999** |
| Appl. No.: | **08/891,261** |
| Filed: | **Jul. 10, 1997** |

(51) **Int. Cl.**
*G07F 7/08* (2006.01)
*G07F 7/10* (2006.01)

(52) **U.S. Cl.** ......................... **235/380**; 235/375; 235/376

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,793, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—John M Hotaling

(57) **ABSTRACT**

Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT



AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1**, **3-5**, **8-11**, **16-19**, **23**, **26-28**, **34**, **36**, **37**, **39-44**, **50**, **52-54**, **57**, **58**, **60**, **62**, **63** and **65** is confirmed.

Claims **2**, **6**, **7**, **12-15**, **20-22**, **24**, **25**, **29-33**, **35**, **38**, **45-49**, **51**, **55**, **56**, **59**, **61**, **64** and **66** were not reexamined.

* * * * *

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ALEXSAM, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, and CIGNA HEALTHCARE OF TEXAS, INC.,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 2:20-cv-00081-JRG-RSP<br>(LEAD CASE) |
| UMB FINANCIAL CORPORATION and UMB BANK N. A.,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§ | Case No. 2:20-cv-00082-RSP<br>(MEMBER CASE) |

**CLAIM CONSTRUCTION MEMORANDUM AND ORDER**

On April 14, 2021, the Court held a hearing to determine the proper construction of disputed terms in United States Patent No. 6,000,608. Before the Court is the Corrected Opening Claim Construction Brief (Dkt. No. 58), filed by Plaintiff Alexsam, Inc. ("Plaintiff" or "AlexSam" or "Alexsam"), the Responsive Claim Construction Brief (Dkt. No. 59), filed by Defendants Cigna Corporation, Cigna Health and Life Insurance Company, Connecticut General Life Insurance Company, Cigna Healthcare of Texas, Inc., UMB Bank, N.A., and UMB Financial Corp. (collectively, the "Defendants"), and Plaintiff's reply (Dkt. No. 60). The parties also filed joint claim construction charts pursuant to P.R. 4-3 (Dkt. No. 36) and P.R. 4-5(d) (Dkt. No. 62).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, considered the intrinsic evidence, and making subsidiary factual findings

about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** .......... **4**
**II. LEGAL PRINCIPLES** .......... **6**
**III. AGREED TERMS** .......... **10**
**IV. DISPUTED TERMS** .......... **10**
1. "multifunction card system" .......... 11
2. "debit/medical services card" .......... 14
3. "medical card" .......... 17
4. "medical services card" .......... 23
5. "debit card" .......... 25
6. "a unique identification number" .......... 29
7. "encoded" .......... 34
8. "a bank identification number approved by the American Banking Association" .......... 35
9. "banking network" .......... 39
10. "transaction processor" .......... 42
11. "processing hub" .......... 45
12. "first database when the card functions as a debit card" .......... 49
13. "second database when the card functions as a medical card" .......... 49
14. "medical identification number" .......... 56
15. "unmodified existing standard point-of-sale device" .......... 59
**V. CONCLUSION** .......... **60**

# I. BACKGROUND

Plaintiff alleges infringement of United States Patent No. 6,000,608 ("the '608 Patent"). Dkt. No. 58 at Ex. A. Plaintiff submits that "[t]he '608 Patent covers a variety of important technologies relating to the debit card industry," and "[t]he multifunction card system disclosed in the '608 Patent enabled consumers and retailers to use existing point-of-sales devices, the existing banking infrastructure, and a bank identification number (BIN) to perform financial transactions . . . ." Dkt. No. 58 at 1.

The '608 Patent, titled "Multifunction Card System," issued on December 14, 1999, and bears a filing date of July 10, 1997. The Abstract of the '608 Patent states:

> Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.

Various courts, including this Court, have construed disputed terms in the '608 Patent:

> *Alexsam, Inc. v. Datastream Card Services, Ltd., et al.*, No. 2:03-CV-337, Dkt. No. 199 (E.D. Tex. June 10, 2005) (Ward, J.) ("*Datastream*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 2–21 of 183 of Exhibit E);
>
> *Alexsam, Inc. v. Humana Inc.*, No. 2:07-CV-288, Dkt. No. 114 (E.D. Tex. Aug. 28, 2009) (Ward, J.) ("*Humana*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 22–38 of 183 of Exhibit E);
>
> *Alexsam, Inc. v. UnitedHealth Group Inc., et al.*, No. 2:07-CV-512, Dkt. No. 102 (E.D. Tex. Dec. 2, 2010) (Everingham, J.) ("*UnitedHealth*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 39–41 of 183 of Exhibit E);
>
> *Alexsam, Inc. v. IDT Corp.*, No. 2:07-CV-420, Dkt. No. 105 (E.D. Tex. June 29, 2010) (Ward, J.) ("*IDT*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 42–60 of 183 of Exhibit E);

*Alexsam, Inc. v. Pier 1 Imports, Inc.*, No. 2:08-CV-15 (E.D. Tex. Aug. 17, 2011) (Everingham, J.) ("*Pier 1*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 61–63 of 183 of Exhibit E);

*Alexsam, Inc. v. Best Buy Co., Inc., et al.*, No. 2:10-CV-93, Dkt. No. 180 (E.D. Tex. Apr. 9, 2012) (Craven, J.) ("*Best Buy*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 64–103 of 183 of Exhibit E);

*Alexsam, Inc. v. Best Buy Co., Inc., et al.*, No. 2:10-CV-93, Dkt. No. 331 (E.D. Tex. Nov. 14, 2012) (Schneider, J.) (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 104–115 of 183 of Exhibit E);

*Alexsam, Inc. v. Green Dot Corp., et al.*, No. 2:15-CV-05742, Dkt. No. 112 (C.D. Cal. June 14, 2016) (Snyder, J.) ("*Green Dot*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 116–141 of 183 of Exhibit E);

*Alexsam, Inc. v. Green Dot Corp., et al.*, No. 2:15-CV-05742, Dkt. No. 124 (C.D. Cal. Sept. 12, 2016) (Snyder, J.) (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 142–145 of 183 of Exhibit E);

*Alexsam, Inc. v. MasterCard Int'l Inc.*, No. 1:15-CV-2799, Dkt. No. 186 (E.D.N.Y. June 11, 2018) (Gold, J.) ("*MasterCard*") (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 146–166 of 183 of Exhibit E); and

*Alexsam, Inc. v. MasterCard Int'l Inc.*, No. 1:15-CV-2799, Dkt. No. 237 (E.D.N.Y. June 17, 2020) (Glasser, J.) (attached to Plaintiff's opening brief (Dkt. No. 58) as pages 167–183 of 183 of Exhibit E).

The parties have also discussed another case regarding the patent-in-suit that is pending in the District of Utah. *See Alexsam, Inc. v. HealthEquity, Inc.*, 477 F. Supp. 3d 1227 (D. Utah 2020) (Nielson, J.) (denying a motion to dismiss based on 35 U.S.C. § 101).

In the present case, Defendants moved to strike Plaintiff's original opening claim construction brief as exceeding the page limit; Defendants also moved to exclude evidence that was allegedly not timely disclosed. *See* Dkt. No. 51. The Court granted Defendants' motion. Dkt. No. 57, Mar. 8, 2021 Order. Plaintiff then filed its Corrected Opening Claim Construction Brief. Dkt. No. 58. In their Responsive Claim Construction Brief (Dkt. No. 59), Defendants argue that

Plaintiff's Corrected Opening Claim Construction Brief cites evidence that had been stricken by the Court. Dkt. No. 59 at 1 (citing Dkt. No. 57).

Even if considered, the evidence challenged by Defendants (*see* Dkt. No. 51 at 4) does not significantly affect the claim construction analysis set forth in the present Claim Construction Memorandum and Order, except as to the prior claim construction orders such as *Datastream*, *Humana*, *UnitedHealth*, *IDT*, and *Green Dot* (cited above). All of these orders are cited by Plaintiff in the parties' P.R. 4-3 statement. *See* Dkt. No. 46, Ex. B. To whatever extent Plaintiff did not adequately cite these prior claim construction orders as to all disputed terms for which Plaintiff cites these prior claim construction orders in Plaintiff's claim construction briefing, consideration of prior claim construction orders is customary and appropriate, and Defendants do not show how any unfair prejudice would result from the Court's consideration of prior claim construction orders regarding the patent-in-suit. This is particularly true given that Defendants have had an opportunity to respond to these prior orders in Defendants' responsive claim construction brief and at the April 14, 2021 hearing, and Defendants have indeed done so. *See* Dkt. No. 51 at 5. As to the other challenged evidence, this evidence does not significantly affect the claim construction analysis set forth in the present Claim Construction Memorandum and Order, so to whatever extent Defendants still seek relief, any such relief is denied as moot.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting

*Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For

example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *See id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Id*. at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context and/or scope for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that

may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *See id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The United States Supreme Court has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus*, 134 S. Ct. 2120.

"[P]rior orders in related cases do not bar the Court from conducting additional construction in order to refine earlier claim constructions." *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-

CV-180-WCB, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J., sitting by designation).

In general, however, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP*, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva*, 135 S. Ct. at 839–40 ("prior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## III. AGREED TERMS

In the January 12, 2021 Joint Claim Construction Chart filed pursuant to P.R. 4-3 (Dkt. No. 46 at 2) and in the March 23, 2021 Joint Claim Construction Chart filed pursuant to P.R. 4-5(d) (Dkt. No. 62, Ex. A at A-4), the parties submit they have agreed that the term "card data" in Claim 32 of the '608 Patent means "data contained on the card."

## IV. DISPUTED TERMS

The parties, in their respective briefing, organize the disputed terms slightly differently. Rather than attempt to divine an ideal ordering and arrangement of the disputed terms, the Court uses the numbering of disputed terms set forth in Plaintiff's opening brief.

**1. "multifunction card system"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>In the alternative, "a card system that can serve a number of functions" | "a card system that serves at least two different functions" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 8; Dkt. No. 59 at 3; Dkt. No. 62, Ex. A at A-1. The parties submit that this term appears in Claims 32 and 33. Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "preamble term is not limiting." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that "the term 'multifunction card system' appears only in the preamble of the Asserted Claim 32 and is not limiting such that no construction is necessary." Dkt. No. 58 at 9. Plaintiff submits that this is consistent with the Court's finding in *Datastream* that the term "multifunction card system" is limiting where it appears in the body of a claim but not where it appears only in the preamble. *Id.* Alternatively, Plaintiff proposes the construction adopted in *Datastream*, *Humana*, and *IDT*. *Id.* "Finally," Plaintiff argues, "it is important to note that the construction proposed by Defendants is facially improper as it requires the system to serve two different functions even though claims of the '608 Patent use the term in circumstances where the system is performing only one function." *Id.*

Defendants respond that "[a]s written, the claimed system 'accesses' multiple databases, and the claimed card 'functions' as distinct cards when it accesses each database . . . ." Dkt. No. 59 at 4. Defendants urge that "[t]he language of the asserted claims requires multiple performed

functions," and "the specification provides no reason to question the unambiguous meaning." *Id.* at 5.

Plaintiff replies that the Court in *Datastream* properly found that the preamble is not limiting. Dkt. No. 60 at 2 (citation omitted).

At the April 14, 2021 hearing, the parties presented oral arguments regarding this term together with their arguments regarding the term "debit/medical services card," addressed below.

(b) Analysis

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes*[, *Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)]. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g.*, *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."); *C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371, 1385 (Fed. Cir. 2012) (finding preambles limiting because "'containers' as recited in the claim body depend on 'a plurality of containers' in the preamble as an antecedent basis").

Here, the term "multifunction card system" appears only in the preamble of Claim 32, which recites (emphasis added):

> 32. A *multifunction card system* comprising:
>
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
>
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

In *Datastream*, the Court found: "With respect to those instances in which the term appears in the preamble, the court holds that it is not a claim limitation." *Datastream* at 11 (citing, as an example, Claim 57).

In some cases, a preamble may be limiting if it states a "fundamental characteristic of the claimed invention," "serves to focus the reader on the invention that is being claimed," or "states the framework of the invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006). Also, a preamble may be limiting if it sets forth a feature "underscored as important by the specification." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (quoting *Catalina*, 289 F.3d at 808). Additionally, in some cases, "[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).

In the present case, Defendants note that the Field of the Invention section of the specification of the '608 Patent uses the term "multifunction card system":

> The present invention relates generally to debit card systems, both bank-issued and non-bank-issued, and more particularly to a *multifunction card system* that can be accessed by a variety of standard point-of-sale devices, by phone, by fax, or over the Internet.

'608 Patent at 1:6–8 (emphasis added).

Yet, the body of above-reproduced Claim 32 already expressly recites a limitation regarding "when the card functions as a debit card" and "when the card functions as a medical card." In other words, the body of the claim already explicitly refers to particular functions.

On balance, the applicable principle is "the presumption against reading a statement of purpose in the preamble as a claim limitation." *Marrin v. Griffin*, 599 F.3d 1290, 1294–95 (Fed. Cir. 2010); *see Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) ("Generally, the preamble does not limit the claims."); *see also Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 769–71 (Fed. Cir. 2018) (in preamble reciting "[a] computer network for providing an information delivery service for a plurality of participants," finding "information delivery service" to be non-limiting because it "merely describe[s] intended uses for what is otherwise a structurally complete invention"). Thus, the claim "defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg.*, 289 F.3d at 808 (citing *Rowe*, 112 F.3d at 478).

In short, this is not a case in which the patentee "use[d] both the preamble and the body to define the subject matter of the claimed invention." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

The Court therefore hereby finds that the term **"multifunction card system,"** which appears in only the **preamble** of Claim 32, is **not limiting**.

**2. "debit/medical services card"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a card that can function as both a debit card and a medical services card" | "a card that functions as both a debit card and a medical services card" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 10; Dkt. No. 59 at 3; Dkt. No. 62, Ex. A at A-1. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a card that can function as both a debit card and a medical services card." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that although this term does not appear in the specification, the claim can be readily understood such that "there is no requirement that the card access a system that actually performs both functions, only that the system be *capable* of performing the functions." Dkt. No. 58 at 11; *see id.* at 10–11.

Defendants respond: "The system accesses one of two databases '*when* the card functions' as a debit or medical card, respectively. Had the patentee meant for either function to be optional, the claim would have read '*if* the card functions.'" Dkt. No. 59 at 5.

Plaintiff replies that Defendants' argument "mistakenly conflates system claims and method claims" and "conflicts with the specification." Dkt. No. 60 at 3.

At the April 14, 2021 hearing, Defendants stressed that the claimed system requires a card that is actually capable of accessing multiple different databases, not a card that is merely capable of being programmed to do so. Plaintiff agreed that the card must be capable of functioning in the two different manners set forth in the claim. Plaintiff also cited authority that the word "when" can be conditional ("in view of the fact that; in the event that; if") rather than necessarily temporal ("at or during") or mandatory. *See FlatWorld Interactives LLC v. Samsung Elecs. Co., Ltd., et al.*, No. 12-804-LPS, Dkt. No. 130 (D. Del. Dec. 31, 2014) (Stark, J.).

(b) Analysis

Claim 32 recites (emphasis added):

> 32. A multifunction card system comprising:
> a. at least one *debit/medical services card* having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when *the card* functions as a debit card and said processing hub accessing a second database when *the card* functions as a medical card.

The term "debit/medical services card" does not appear in the written description portion of the specification.

Defendants argue that all four limitations—including limitation "d" that includes the "when the card functions . . ." limitations that are the focus of the present dispute—are "drafted in the present participle" verb form, and "AlexSam does not—and cannot—argue that all of the other limitations drafted in the present participle are also optional, as that would leave the claim with no limitations at all." Dkt. No. 59 at 5.

But Plaintiff does not argue that the "when the card functions . . ." limitations are optional. Rather, Plaintiff argues that "the card must only be *capable of* performing the functions described in the claims, not actually perform them." Dkt. No. 58 at 10. Plaintiff's interpretation is consistent with the overall form of the claim, which is directed to a system rather than a method. *Cf. Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (in finding that an apparatus claim did not recite method steps and therefore was not an impermissible mixed method-apparatus claim, noting that the claim "is clearly limited to a . . . processor possessing the recited structure and *capable* of performing the recited functions"). This interpretation is consistent with the legal principle cited by both sides that "[t]he claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

This is consistent with disclosure in the specification regarding "a need for a card system which *can* serve a number of functions." '608 Patent at 3:2–7 (emphasis added); *see id.* at 10:61–

64 ("The system 108 can access each of the databases discussed above and can simultaneously increase or decrease each database as needed by the type of transaction occurring.").

This is also consistent with the Court's background discussion of Claims 32 and 33 in *Humana*:

> In this case, Alexsam has asserted claims 32 and 33 of the '608 patent against Humana. Those claims involve a system that relates to debit and medical services cards along with the associated debit and medical-related databases. The debit/medical card is associated with an account that maintains medical funds, such as a medical savings account, and is used to authorize financial transactions. The same card may also provide access to medical information such as Medicare information for the patient or the patient's medical history.

*Humana* at 3. *Humana* rejected a proposal to limit the disputed term, finding that "the specification of the '608 patent does not 'repeatedly reinforce' the usage of the term 'medical services' to mean 'medical information' that would relate only to a patient's medical history." *Id.* at 9 (citation omitted). *Humana* also rejected a proposal of the phrase "can be used," instead stating: "The Court notes that the patent consistently describes the cards as capable of performing 'functions.'" *Id.* at 10. *Humana* construed "debit/medical services card" to mean "a card that can function as both a debit card and a medical services card" (*id.*; *see UnitedHealth* at 2 (adopting *Humana* construction)), and Plaintiff proposes this construction in the present case.

Based on the above-discussed evidence and authorities, the Court construes **"debit/medical services card"** to mean **"a card that can function as both a debit card and a medical services card."**

**3. "medical card"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a card that allows access to a database containing medical information" | "a card that provides access to a separate database that contains a card holder's medical information/history and card account funds" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 12; Dkt. No. 59 at 6; Dkt. No. 62, Ex. A at A-5. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-5.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a card that allows access to a database containing medical information." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that whereas "AlexSam's proposed construction is consistent with both the Specification and prior claim construction orders of this Court" in *Humana* and *UnitedHealth*, "Defendants' proposed construction has already been rejected in part while other aspects, which are thinly veiled attempts to introduce non-infringement arguments, are uncertain and confusing." Dkt. No. 58 at 12. Plaintiff also argues that "Defendants have proposed a construction that raises more questions than it answers," and "the *card* allows access by initiating a transaction – it does not *provide* access, . . . which is performed by other elements of the claimed system." *Id.* at 13.

Defendants respond that "[t]he '608 Patent (including asserted claims 32 and 33) uses '*medical services card*' and '*medical card*' synonymously to claim a card that facilitates 'accessing' a distinct database (a 'second database') containing the card holder's medical information/history so the medical information may be retrieved by a medical services provider." Dkt. No. 59 at 6–7 (footnote omitted). Defendants argue "Claim 32 expressly provides that 'when the card functions as a medical card,' the processing hub must access a completely different database – 'a second database,' and 'when the card functions as a debit card,' the processing hub must access a separate and distinct 'first database.'" *Id.* at 7. Defendants submit that "AlexSam's construction is designed to improperly allow a juror to conclude that 'debit card' information and 'medical services card'/'medical card' history information may be in the same database, which is

directly contrary to the ’608 Patent and the express language of the claims.” *Id.* Defendants argue the Court’s prior *Humana* and *UnitedHealth* constructions should be reevaluated, given that Plaintiff recently stipulated to a different construction in *MasterCard*. *Id.* at 7–8. Finally, Defendants argue:

> The ’608 Patent requires and uniformly explains that, on the one hand, the “medical information database” 207 (the “second database” in asserted Claims 32 and 33) stores medical information/history, *not* “debit card” data, which is stored in a separate database (the “first database”), and is solely associated with and when the card functions as a “medical services card”/“medical card.” [’608 Patent] at 10:12–14. On the other hand, the separate and distinct “Debit Card” Database, “Loyalty Card Database” 206, and “Electronic Gift Certificate (‘ECG’) Database” 205 are dedicated to containing different information and accessed only when the multifunction card functions as a “debit card,” “loyalty card,” or “EGC card,” respectively, not as a “medical services card”/“medical card.” *Id.* at 8:22–24; 9:16–20; 9:46–52; 9:65–10:2; 10:3–6; FIG. 2.

*Id*. at 10.

Plaintiff replies that the same arguments presented by Defendants in the present case were considered and rejected in *Humana*. *See* Dkt. No. 60 at 4. As to Defendants’ proposal of referring to “card account funds,” Plaintiff argues that “the claim language plainly associates access to funds to the ‘debit card’ functionality.” *Id.*

At the April 14, 2021 hearing, the parties argued this term together with the term “debit/medical services card.”

<u>(b) Analysis</u>

Claim 32 recites (emphasis added):

> 32. A multifunction card system comprising:
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a *medical card*.

The contrast between "a debit card" and "a medical card" in limitation "d" reflects the distinction between "debit" and "medical" (or perhaps between "debit" and "medical services") in limitation "a." The term "medical card" appears only in the claims, but the Background of the Invention section of the specification provides an example regarding medical information:

> [I]n order to obtain a patient's medical history, the patient or his or her doctor must request the appropriate files from the patient's previous doctor(s). It often takes a number of days to receive the requested information. In a medical emergency, this delay is often far too long. Thus, there is a need for patients to have control over their own medical history data. Further, there is a need for this data to be instantly available to the patient.

'608 Patent at 2:56–63. The specification provides further context by disclosing:

> [T]he multifunction card system 108 of the present invention is capable of providing an information retrieval card. In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided. Each participating patient's medical information is stored in a record in a medical information database 207 maintained at the processing hub 103. The record contains the identification number encoded on the patient's card 101.
>
> When medical history information data is needed, it may be requested by swiping the card 101 through a POS device 105 at a participating doctor's office or hospital. Preferably, a PIN is entered into the POS device 105 to ensure that only an authorized person is able to request the information. The POS device 105 would then send the request to the processing hub 103 via one of the routes described above. When the processing hub 103 receives the request from the authorized requester, it then immediately sends the information to the requestor via means preselected by the participating doctor's office or hospital. Such means may include electronic mail, facsimile, voice response, and other similar means. The medical history information may be updated by the patient or his or her doctor or insurer by forwarding new information to the operator of the system 108 via an on-line connection, over the Internet, by telephone, by facsimile, or by mail.

*Id.* at 10:8–32. This disclosure also continues by referring to medical funds:

> In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system 108 also allows access to a database which maintains the medical funds for the cardholder. As described above under the Electronic Gift Certificate™ section, the system 108 is able to authorize, reject, and cause money to be transferred based upon the cardholder's available medical funds.

*Id.* at 10:40–47.

Defendants' expert opines that "[t]he '608 Patent uses the words 'medical information' and 'medical history' interchangeably to mean and define the same thing," and Defendants' expert cites portions of the above-reproduced disclosure for support. Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 51.

Defendants' expert's opinions in this regard are unpersuasive, as is Defendants' expert's conclusion that "the 'medical services card'/'medical card' must provide access to both (i) medical information/history and (ii) card account funds." *Id.* at ¶ 53; *see id.* at ¶¶ 51–53. Instead, these disclosures regarding a "medical information card" ('608 Patent at 10:10–11) demonstrate that medical information *may include* medical history.

Likewise, in *Humana* the parties disputed whether the term "medical card" requires facilitating "retrieval of the patient's medical history information" or instead "refers to the function of accessing any medical-related database." *Humana* found:

> [T]he Court also disagrees with Humana that the patent claim is so narrow as to encompass only the patient's medical history information. Humana points to several places in the specification that disclose access to "medical information." In light of this disclosure, Humana argues that the Court should ignore the single instance of disclosure in the specification that suggests that the card may be used "to keep track of medical savings accounts or various other means for paying for medical services." *See* '608 patent, 10:40–47. More specifically, the specification discloses that the card may be used to access a Medicare database. *Id.* Given that a patient's Medicare account is neither a "debit" account nor a "medical history information" account, the Medicare database fails to fit into either of the two categories that Humana suggests would be encompassed by this claim. The Court refuses to read out an embodiment disclosed in the specification. *See Vitronics v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (noting that a construction

> which would result in excluding the preferred embodiment "is rarely, if ever, correct"). The Court finds that there is sufficient support in the specification to allow the scope of this claim term to extend more broadly to all databases that contain "medical information."
>
> The Court construes this term as: "A card that allows access to a database containing medical information."

*Humana* at 11–12. *UnitedHealth* adopted this construction (*see UnitedHealth* at 2), and this is the construction that Plaintiff proposes in the present case.

Defendants argue that "AlexSam's construction is designed to improperly allow a juror to conclude that 'debit card' information *and* 'medical services card'/'medical card' history information may be in the same database, which is directly contrary to the '608 Patent and the express language of the claims." Dkt. No. 59 at 7. Defendants contrast the disclosure of "medical information database 207" with the disclosure of other databases such as "loyalty card database 206." *Compare* '608 Patent at 10:12–14 *with id.* at 8:22–24, 9:16–20, 9:46–52, 9:63–67, 10:3–6; *see id.* at FIG. 2.

Defendants also point out that the parties in the *MasterCard* case stipulated that "medical card" means: "A card that allows access to a database containing medical information specific to the cardholder or someone associated with the card holder with respect to the medical information accessed." *MasterCard* at 9.

The claim, however, contains other language directed to "accessing a first database" and "accessing a second database." *See* '608 Patent at Cl. 32 ("said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card"). Defendants' proposal of "[a] card that provides access to a *separate* database" should therefore be rejected.

Finally, as to Defendants' proposal of referring to a database that contains "card account funds," the specification refers to "a database which maintains the medical funds for the cardholder" but does *not* state that those funds reside in the same database as medical information. *See* '608 Patent at 10:40–47. Further, even assuming for the sake of argument that this disclosed embodiment includes medical funds residing in the same database as medical information, Defendants do not justify importing any such feature into the claim construction. *See Phillips*, 415 F.3d at 1323.

The Court therefore hereby construes **"medical card"** to mean **"a card that allows access to a database containing medical information."**

**4. "medical services card"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning in light of "debit/medical services card" and "medical card" | "a card that provides access to a separate database that contains a card holder's medical information/history and card account funds" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 13; Dkt. No. 59 at 6; Dkt. No. 62, Ex. A at A-1. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a card that allows access to a database containing medical information." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff submits: "Defendants have erroneously included a term 'medical services card' for construction that does not exist in the claims. There is no such thing as a 'medical services card.' Instead, the term is only used in Claim 32 and only as a combined term — 'debit/medical services card.'" Dkt. No. 58 at 13. Plaintiff urges that "there is no separate card (a debit card) in

Claim 32, only a card that provides access to a system that includes a processing hub that can access 'a first database when the card functions as a debit card and . . . a second database when the card functions as a medical card.'" *Id.* at 14.

Defendants argue this term together with the term "medical card," which is addressed above. *See* Dkt. No. 59 at 6–10.

Plaintiff replies that "Defendants improperly attempt to conflate a 'medical services card' and a 'medical card,' which violates the principles of claim differentiation." Dkt. No. 60 at 10.

At the April 14, 2021 hearing, the parties argued this term together with the term "debit/medical services card."

(b) Analysis

Claim 32 recites (emphasis added):

> 32. A multifunction card system comprising:
> a. at least one *debit/medical services card* having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
> d. said processing hub accessing a first database when the card functions as a *debit card* and said processing hub accessing a second database when the card functions as a *medical card*.

In light of the construction of the larger term "debit/medical services card" (above), as well as with the context provided by the subsequent recitals of a "debit card" (discussed below) and a "medical card" (discussed above), the patentee used the term "medical services card" as a synonym for "medical card."

Plaintiff argues that finding these terms synonymous "violates the principles of claim differentiation." Dkt. No. 60 at 10 (citing *Phillips*, 415 F.3d at 1314, *Ortho-McNeil Pharm., Inc.*

*v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1327–28 (Fed. Cir. 2007) & *Anchor Wall Sys. Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003)). But although using different terms to have the same meaning may be "poor drafting practice," the inference that different terms have different meanings "is not conclusive; it is not unknown for different words to be used to express similar concepts." *Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004). Plaintiff's arguments and authorities are unpersuasive, and nothing in the specification is inconsistent with reading these terms as synonymous. Indeed, the terms "medical card" and "medical services card" do not appear anywhere in the patent other than in the claims. Further, Plaintiff does not demonstrate that the word "services" has any special significance here. Instead, the operative word appears to be "medical."

The Court therefore hereby construes **"medical services card"** to mean **"a card that allows access to a database containing medical information."**

**5. "debit card"**

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| Plain and ordinary meaning | "a card (not a pre-paid, credit, electronic gift certificate, or loyalty card) issued by a bank that provides access to funds from an accountholder's non-medical savings or checking account" |

Dkt. No. 46, Ex. A at 1; Dkt. No. 58 at 14; Dkt. No. 59 at 11; Dkt. No. 62, Ex. A at A-1. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 1; Dkt. No. 62, Ex. A at A-1.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "plain and ordinary meaning." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that "Defendants seek a construction of the well-known term 'debit card' to *exclude* medical savings and checking accounts even though the context of the claim does not support such a conclusion." Dkt. No. 58 at 14. Plaintiff submits:

> A readily understandable definition, which has not changed since the filing of the application for the '608 Patent, is simply: "A debit card is a payment card that deducts money directly from a consumer's checking account to pay for a purchase." *See, e.g.*, https://www.investopedia.com/terms/d/debitcard.asp. This current definition is consistent with common usage [of] the term at the time of application. *See, e.g.*, https://www.nytimes.com/1997/04/02/business/not-all-plastic-is-created-equal-when-it-comes-to-renting-a-car.html. (Saul Han[se]ll, []*Not All Plastic Is Created Equal When It Comes To Renting A Car*, New York Times, April 2, 1997.) ("Charges on debit cards, which go under many names, come directly out of a customer's checking account almost immediately rather than appearing on a monthly credit card statement. And in contrast to using a credit card, which the debit cards physically resemble, no loan is involved in the transaction.").

*Id.* at 15. Plaintiff also argues that "debit cards need not be issued by a bank only by a banking institution (*e.g.*, credit unions also provide such cards)." *Id.* (citing '608 Patent at 1:11–13).

Defendants respond that "[t]he '608 Patent draws a firm and unwavering distinction between debit cards and various other types of cards . . . ." Dkt. No. 59 at 11 (citing '608 Patent at 4:14–19). Defendants also argue:

> As the '608 Patent uniformly explains, when the claimed multifunction card is used as a "medical services card" (synonymous with "medical information card" and "medical card"), the card accesses and retrieves the patient's (card holder's) medical history from a separate and distinct "medical information database 207." '608 Patent at 10:9–15. Thus, the "debit card" functionality is for "non-medical" funds, and the "medical services card" functionality is directed to "medical" history and medical funds.

*Id*. at 12–13.

Plaintiff replies that "the term 'debit card' is used to describe how the 'debit/medical services card' has the ability to authorize debit transactions related to medical services; therefore,

the Court should decline to construe this term because the term is consistent with that plain and ordinary meaning." Dkt. No. 60 at 10.

At the April 14, 2021 hearing, Defendants urged that a "debit card" provides access to funds, not information.

<u>(b) Analysis</u>

The Background of the Invention section of the specification includes a subsection titled "Debit Cards," which states:

> I. Debit Cards
>
> Banking institutions often issue debit cards to their customers to give them access to funds from their savings or checking accounts. Such a debit card might be an on-line debit card or an off-line debit card. On-line debit cards, often referred to as automatic teller machine (ATM) cards, require a personal identification number (PIN) to be entered into an ATM or point-of-sale (POS) device in order to authorize the transaction. Once completed, the transaction clears the bank account immediately. Off-line debit cards function like credit cards, and usually carry the VISA® or MasterCard® logo. A retailer processes the card like a credit card and the customer signs a receipt. The funds then clear the bank account in one to three days.
>
> While such debit cards are extremely useful and provide convenience for bank depositors, they generally do not serve a plurality of functions. Therefore, there is a need in the art for a debit/credit card capable of performing a plurality of functions, such as an electronic gift certificate card, a prepaid phone card, and a loyalty card, all in a real-time secure environment. There is also a need in the art for a system which can provide a card substitute for travelers checks and money orders which can be accepted by any POS device or ATM for financial transactions. Further, there is a need for a processing center which can manage such a multifunction card system.

'608 Patent at 1:10–35.

As to Defendants' proposal of requiring providing access to a "non-medical savings or checking account," Defendants highlight a distinction in the specification between a "medical information database 207" and other databases. *See id.* at 10:7–47. Defendants identify no disclosure, however, that would preclude a debit card from being used to access an account that

holds medical funds or otherwise using a debit card to pay for medical expenses. Instead, the specification discloses generically that "the system 108 also allows access to a database which maintains the medical funds for the cardholder." *Id.* at 10:42–44.[1]

Likewise, Defendants highlight disclosure in the specification that "[t]he present invention is a multifunction card system which allows for the activation of prepaid phone cards and the use of Electronic Gift Certificate™ cards, loyalty cards, debit cards, and medical information cards" ('608 Patent at 4:14–19), but Defendants fail to demonstrate how this distinction between "debits cards" and "medical information cards" purportedly precludes a "debit card" from being used to pay for medical services or to access an account that holds medical funds. *See* Dkt. No. 59 at 11.

As to Defendants' proposed parenthetical distinguishing between "debit cards" and prepaid cards, credit cards, loyalty cards, and electronic gift certificate cards, introducing this exclusionary language would tend to confuse rather than clarify the scope of the claims, and Defendants fail to demonstrate the necessity of burdening the construction with this language. Instead, the above-reproduced disclosure confirms that the plain meaning of "debit card" is distinct from prepaid cards, credit cards, loyalty cards, and electronic gift certificate cards.

Finally, as to Defendants' proposal of requiring that a debit card must be issued by a "bank," the above-reproduced disclosure refers to debit cards issued by "banking institutions," which evidently is broader than Defendants' proposal of "bank." '608 Patent at 1:11–13. Moreover, the Field of the Invention section at the beginning of the specification states that "[t]he

[1] Defendants also argue: "While the 'debit card' database ('first database') is for typical savings and banking account funds, AlexSam also admits that the 'second database' 'keeps track of and maintains medical funds as a means for obtaining medical services.'" Dkt. No. 59 at 13 (quoting Dkt. No. 58 at 28). The portion of Plaintiff's opening brief quoted by Defendants, however, does *not* describe the "second database" or the "medical information database 207" as maintaining medical funds. Rather, Plaintiff's brief argues that there is another database, *distinct from* the "medical information database 207," that maintains medical funds. *See* Dkt. No. 58 at 28 ("[T]he Specification identifies a separate database (*i.e.*, not database 207) that keeps track of and maintains medical funds as a means for obtaining medical services.") (emphasis omitted).

present invention relates generally to *debit card* systems, *both bank-issued and non-bank-issued* . . . ." *Id.* at 1:4–5 (emphasis added).

The Court therefore hereby expressly rejects Defendants' proposed construction. No further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court therefore hereby construes **"debit card"** to have its **plain meaning**.

**6. "a unique identification number"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary; Plain and ordinary meaning; Not Indefinite | Indefinite |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 16; Dkt. No. 59 at 13; Dkt. No. 62, Ex. A at A-2. The parties submit that this term appears in Claims 32 and 33. Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-2.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "plain and ordinary meaning." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that this term is not indefinite because:

> First, a description and examples of a UIN [(Unique Identification Number)] are provided in the Specification. *See e.g.,* Ex. A ['608 Patent] at 3:11–15 and 3:42–46. Second, the '608 Patent explains that a UIN is encoded on a card. *See id.* at 3:12–13. Also, a UIN is part of the card's activation data. *See id.* at 3:18–20. Further, a UIN includes a bank identification number corresponding to the card system. *See id.* at 3:38–41. Finally, the UIN is in fact expressly disclosed and claimed as "comprising a bank identification number" and a "medical identification number." *Id.* at Claims 32 and 33.

Dkt. No. 58 at 16. Plaintiff also notes that claim constructions in prior cases have not found indefiniteness and instead have found no construction necessary, have construed the term, or have included the term in the constructions of other terms. *Id.* at 16–17.

Defendants respond: "This term is indefinite as there are two '*a* unique identification number' in Claim 32, and Claim 33 recites '*the* unique identification number' without identifying which of the two 'unique identification number[s]' in Claim 32 it refers. It is also unclear what these purportedly unique identification numbers *are unique to*." Dkt. No. 59 at 13. Defendants also submit that "under the applicable standard, ISO 7812, there is no leading number that can be associated with both a banking/financial account and a medical account." *Id.* at 14. Further, Defendants argue that bank account identification numbers are associated with bank accounts, which may have multiple account holders, so it is unclear how to "have the same number that identifies a bank account also identify an individual's health records." *Id.* at 15.

Plaintiff replies that both instances of "a unique identification number" in Claim 32 refer to the same unique identification number of the card. Dkt. No. 60 at 6. Plaintiff also argues that the claim sets forth no requirement for identifying one specific person. *See id.* at 6–7.

At the April 14, 2021 hearing, Defendants reiterated arguments set forth in their briefing. Plaintiff responded that the meaning of this term is clear in the context in which the term appears in the claims.

(b) Analysis

Claims 32 and 33 recite (emphasis added):

> 32. A multifunction card system comprising:
> a. at least one debit/medical services *card* having *a unique identification number* encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
> b. a transaction processor receiving *card data* from an unmodified existing standard point-of-sale device, said card data including *a unique identification number*;
> c. a processing hub receiving directly or indirectly said *card data* from said transaction processor; and
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when *the card* functions as a medical card.
>
> 33. The multifunction card system of claim 32, wherein *the unique identification number* further comprises a medical identification number.

The Federal Circuit in *Microprocessor Enhancement* stated that "the patentee's mere use of a term with an antecedent does not require that both terms have the same meaning." 520 F.3d at 1375. The Federal Circuit distinguished its *Process Control* case, in which the court found that multiple instances of "discharge rate" referred to the same rate. *See id.* at 1375–76. In *Microprocessor Enhancement*, the court reversed a finding of indefiniteness that was based on the claims reciting multiple instances of "condition code," "the condition code," and "said condition

code," and the court explained that "the appropriate meaning of 'condition code' is readily apparent from each occurrence in context." *Id.* at 1376.

In the present case, however, a fair reading of Claim 32 is that the second instance of "a unique identification number" (in limitation "b") refers back to the first instance of "a unique identification number" (in limitation "a"). This is apparent when the claim is read as a whole because, for example, the recital of the operation of the processing hub in limitations "c" and "d" involves the "card data" recited in limitation "b" *and also* refers to "the card" that is first introduced in limitation "a." *See Phillips*, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"); *see also Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole.") (citations omitted). The recital of "the unique identification number" in Claim 33 then refers to the same "unique identification number" recited throughout Claim 32. The opinion of Defendants' expert to the contrary is unpersuasive. *See* Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 85.

This is consistent with disclosures in the specification that an identification number is encoded on a card:

> To access these POS devices, the operator of the system 108 must apply for and obtain a Bank Identification Number (BIN) from the American Banking Association. The BIN serves as a unique identifier of the multifunction card system 108 within the banking network. The BIN is encoded on a magnetic strip 106 on each card 101 in the system 108 as a part of the card's *identification number*. Alternatively or additionally, the BIN and *identification number* could be encoded as a bar code, embossed on the surface on the card 101 in numerals for manual entry, or provided by any other means known in the art.

'608 Patent at 4:36–46 (emphasis added).

The remaining issue is whether these claims are unclear as to the meaning of "unique." As a threshold matter, Plaintiff notes that the parties in *Humana* agreed to "no construction necessary"

for the term "unique identification number." *Humana* at 8. This agreed-upon construction in *Humana* is of some (albeit limited) persuasive value. Plaintiff also cites the *Green Dot* case, in which the Central District of California found that the term "unique identification number" "do[es] not require the Court's construction." *Green Dot* at 25. Further, in *IDT*, the parties presented competing proposed constructions, and the Court adopted the agreed-upon portion of those competing construction by construing "unique identification number" to mean "a one of a kind identification number." *IDT* at 18–19.

Thus, prior constructions of the disputed term have had no difficulty with the meaning of "unique" in the context of these claims. Defendants argue that as to the first digit of an identification number, "under the applicable standard, ISO 7812, there is no leading number that can be associated with both a banking/financial account and a medical account." Dkt. No. 59 at 14 (citing Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 93). Even assuming for the sake of argument that ISO 7812 is applicable and that a financial "leading number" cannot be used as part of a medical identification number, Defendants do not show that the requirement in Claim 33 of "the unique identification number further comprises a medical identification number" necessarily affects the leading number. That is, "further compris[ing] a medical identification number" could refer to a portion of the unique identification number that does not include the leading number.

Finally, Defendants submit that a person of ordinary skill in the art ("POSITA") "would have understood bank identification numbers to identify accounts, not individuals," and "[i]t would thus be unclear to a POSITA how to resolve the common issue of joint bank accounts to have the same number that identifies a bank account also identify an individual's health records." *Id.* at 14–15 (citing Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶¶ 101–03). Defendants' argument in this regard, and the corresponding opinions of Defendants' expert (*see id.*), are unpersuasive because

Defendants identify no claim language, definition, or disclaimer requiring a "unique identification number" to be associated with a specific person (rather than, for example, with an account).

The meaning of "unique identification number" is therefore sufficiently clear in the context of Claims 32 and 33. *See Kyocera*, 545 F.3d at 1347 ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as a whole.") (citations omitted). The opinions of Defendants' expert to the contrary are unpersuasive. *See* Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶¶ 86–104.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, so no further construction is necessary.

The Court accordingly hereby construes **"a unique identification number"** to have its **plain and ordinary meaning**.

**7. "encoded"**

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| No construction necessary; Plain and ordinary meaning<br><br>Alternatively:<br>"placed into a code" | "coded on a magnetic strip of a card or as a bar code"[2] |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 18; Dkt. No. 59 at 15; Dkt. No. 62, Ex. A at A-3. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-3.

[2] Defendants previously proposed: "Coded on a magnetic strip of a card." Dkt. No. 46, Ex. A at 2. Defendants submit: "Defendants have slightly broadened their original construction to reference 'a bar code.'" Dkt. No. 59 at 15 n.6.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "plain and ordinary meaning." Both sides agreed to the Court's preliminary construction.

The Court therefore hereby construes **"encoded"** to have its **plain and ordinary meaning**.

**8. "a bank identification number approved by the American Banking Association"**

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| "a numeric code which identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association" | "a numeric code that identifies a card-issuing financial institution and that is obtained from or approved by the American Banking Association" |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 19; Dkt. No. 59 at 16; Dkt. No. 62, Ex. A at A-3. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-3.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a numeric code that identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that "[t]he problem with the Defendants' proposed construction, which is the same proposed construction and argument that other alleged infringers have attempted in the past, is that there is no American *Banking* Association, and the reference to it in the claims is a simply typographical error." Dkt. No. 58 at 19. Plaintiff asserts that correcting this so as to refer to "Bankers" instead of "Banking" satisfies the necessary conditions for judicial correction. *Id.*

Defendants respond that the claim must be interpreted as written and, moreover, "the patentee repeatedly used the claim term 'American Banking Association' when making

amendments to overcome cited prior art." Dkt. No. 59 at 16–17. Defendants also argue that "the complete absence of 'American Bankers Association' in any of the intrinsic evidence distinguishes this case from situations where courts corrected typographical errors." *Id.* at 17.

Plaintiff replies that "Defendants are making the exact same argument that the defendants in *AlexSam v. DataStream* made, and this Court rejected." Dkt. No. 60 at 1.

At the April 14, 2021 hearing, the parties presented no oral argument and instead rested on their briefing.

(b) Analysis

Judicial correction of an error in a patent may be available "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003); *see Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed. Cir. 2005) ("we have held that in some circumstances the district court can correct errors retroactively"; discussing *Novo*). Defendants emphasize the general principle of construing a claim "as written, not as the patentees wish they had written it." *See, e.g.*, *Chef Am. Inc. v. Lamb Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

Claim 32 recites (emphasis added):

> 32. A multifunction card system comprising:
>
> a. at least one debit/medical services card having a unique identification number encoded on it comprising *a bank identification number approved by the American Banking Association* for use in a banking network;
>
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
>
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and

> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

The specification discloses:

> To access these POS devices, the operator of the system 108 must apply for and obtain a *Bank Identification Number (BIN) from the American Banking Association*. The BIN serves as a unique identifier of the multifunction card system 108 within the banking network. The BIN is encoded on a magnetic strip 106 on each card 101 in the system 108 as a part of the card's identification number. Alternatively or additionally, the BIN and identification number could be encoded as a bar code, embossed on the surface on the card 101 in numerals for manual entry, or provided by any other means known in the art.
>
> *Preferably, the BIN's first digit will be the same number as the first BIN digit used by a popular card issuer*. This is because POS devices are preprogrammed to recognize only certain types of cards, such as those issued by VISA® and MasterCard®, American Express®, etc. As a rule, these POS devices must be reprogrammed before they will accept a new type of card. However, since POS devices already recognize cards issued by these popular card issuers, a new type of card will also be recognized by such devices if it has a BIN that begins with the same number used by one of the popular card issuers. Since VISA® and MasterCard® are the most universally accepted cards, the BIN of the multifunction card system 108 of the present invention preferably will begin with the same number used by either VISA® or MasterCard® (i.e., "4" or "5", respectively). By using one of these numbers, the card 101 will be recognized by almost all existing POS devices 105 as a debit or credit card, and its transactions will be automatically routed by the banking system to the correct destination. This occurs regardless of the type of POS device 105 used, since all such devices are designed to interface with the banking network. Although the BIN number will preferably begin with a "4" or "5", it may begin with any number that is recognized by POS devices 105.

'608 Patent at 4:36–5:3 (emphasis added).

A person of ordinary skill in the art would understand from the claim language and this disclosure in the specification that the patentee intended to refer to the American Bank*ers* Association. This correction "is not subject to reasonable debate based on consideration of the claim language and the specification." *Novo*, 350 F.3d at 1357. Indeed, the parties agree that *there is no* American Bank*ing* Association but there *is* an American Bank*ers* Association that is

responsible for issuing the types of identification numbers described in the above-reproduced disclosure. *See* ’608 Patent at 4:36–5:3.

Further, “the prosecution history does not suggest a different interpretation of the claims.” *Novo*, 350 F.3d at 1357. Defendants submit that the patentee repeatedly used the term “American Bank*ing* Association” when making amendments to overcome cited prior art. Dkt. No. 59, Ex. 2, June 24, 1999 Amendment at 1–10 (claim amendments), 11 (“Bank identification numbers are assigned by the American Banking Association (ABA) for use in industry standard banking transactions over existing banking networks such as those utilized in the processing of credit card (e.g. Visa, MasterCard, American Express), and debit cards issued by banks.”), 13 (“there is no teaching or suggestion in Stimson or any other reference to incorporate a bank identification number approved by the ABA”), 15, 19 (“Taylor contains no teaching or suggestion of incorporating bank ID numbers approved by the ABA”), 20 (“bank identification approved by the American Banking Association for use in a banking network”) & 22 (similar). Defendants also argue that “[t]he patentee had ample opportunities to change the claim term had it wished to do so, but it never did,” and “the patentee never sought a Certificate of Correction to alter the claim term.” Dkt. No. 59 at 17.

This prosecution history, however, merely reflects repetition of the same error that appears in the above-reproduced issued claim.

Also of note, the Court in *Datastream* reached the same conclusion regarding the appropriateness of judicial correction of this error, and *Datastream* thus interpreted “American Banking Association” as referring to the American Bank*ers* Association. *See Datastream* at 5 (“there is no American Bank*ing* Association, and the reference to it in the claims is a typographical error”).

The Court therefore hereby construes **"a bank identification number approved by the American Banking Association"** to mean **"a numeric code that identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association."**

**9. "banking network"**

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions and utilizes a processing hub" | "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions, and which does not include a processing hub (which term is indefinite)" |

Dkt. No. 46, Ex. A at 2; Dkt. No. 58 at 20; Dkt. No. 59 at 18; Dkt. No. 62, Ex. A at A-3. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 2; Dkt. No. 62, Ex. A at A-3.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which incorporates and utilizes a processing hub." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that the dispute as to "banking network" depends on the dispute regarding "processing hub," which is a disputed term addressed separately below. Dkt. No. 58 at 20.

Defendants respond that Plaintiff fails to address the dispute. "Defendants contend the 'banking network' necessarily excludes a 'processing hub,' even if the latter purportedly takes advantage of the former." Dkt. No. 59 at 18.

Plaintiff replies that "AlexSam is proposing the construction of 'banking network' issued in *IDT*, which specifically included the 'processing hub' into its construction of 'banking network,' based upon the prosecution history and the specification." Dkt. No. 60 at 5.

(b) Analysis

Claim 32 recites (emphasis added):

> 32. A multifunction card system comprising:
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a *banking network*;
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

Defendants argue that "nothing in the claim language or the specification supports inclusion of the processing hub within the recited banking network," and "it is not possible for the processing hub to be a part of the definition of banking network, because, according to AlexSam, banking networks pre-existed the invention." Dkt. No. 59 at 18–19.

*Datastream* construed the term "banking network" to mean "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions." *Datastream* at 11. The parties in *UnitedHealth* agreed to this construction. *UnitedHealth* at 2.

*IDT* rejected the defendant's proposal of requiring a *bank* processing hub, but *IDT* adopted the defendant's proposal to construe "banking network" to mean "a set of interconnected computers used by banks and financial institution[s] for purposes of conducting and processing financial transactions, *and which incorporates and utilizes a processing hub*." *IDT* at 14 (emphasis

added); *see id.* at 14 (citing prosecution history). Later, *Best Buy* reviewed the analysis in *IDT*, including as to the prosecution history, and *Best Buy* reaffirmed that "the invention is not limited to the use of bank processing hubs." *Best Buy* at 17; *see id.* at 14–18. *Best Buy* adopted the *IDT* construction. *Id.* at 18. Also, the parties in *MasterCard* agreed to this construction. *MasterCard* at 6.

Defendants have not justified departing from the prior constructions of this disputed term, *see, e.g.*, *TQP*, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."), except that in the present case neither side proposes including the word "incorporates," and the parties substantially agreed at the April 14, 2021 hearing that the "processing hub" in Claim 32 is not part of a conventional banking network but rather operates *in conjunction with* such a banking network. *See, e.g.*, '608 Patent at 4:25–29 ("In order to achieve the desired functionality, the system 108 uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices 105.") & 5:4–8 (referring to a "link between the processing hub 103 and the banking network"). The Court in the present case therefore omits the word "incorporates" from the construction.

Finally, to whatever extent Defendants are arguing that the term "banking network" *precludes* a processing hub from being placed *within* a banking network, the Court hereby expressly rejects any such exclusion. Again, although the "processing hub" recited in Claim 32 would not have been present in a conventional banking network at the time of the invention, such a processing hub can operate in conjunction with a banking network. *See id.*

The Court therefore hereby construes **"banking network"** to mean **"a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which utilizes a processing hub."**

**10. "transaction processor"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device"; Not Indefinite | Indefinite |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 21; Dkt. No. 59 at 19; Dkt. No. 62, Ex. A at A-4. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A at A-4.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that this term is not indefinite because "a 'transaction processor' is a long-recognized structure in the debit card industry" that receives data from point-of-sale devices and then routes the data to processing hubs. Dkt. No. 58 at 21 (citations omitted); *see id.* at 21–24.

Defendants respond that "AlexSam and its expert have even relied on the transaction processor to oppose the ineligibility of the asserted claims," and "[a]ccordingly, it must have some specific structure, beyond a simple component that receives and forwards data, to allow it to fulfill the many functions described in the patent." Dkt. No. 59 at 19. Defendants argue that "neither the claims nor the specification explains what the transaction processor encompasses or how it is

able to perform all of these varying functions." *Id.* at 20. Defendants further argue that "the term is functionally claimed, using language that describes the goal of its functions without reciting how to achieve those functions." *Id.*

Plaintiff replies that "Defendants' indefiniteness argument should be found moot" because "AlexSam acknowledges that a transaction processor was an existing component within the banking and payment industry used by merchants prior to, and after, the invention." Dkt. No. 60 at 7. Plaintiff submits that "[w]ithin the '608 Patent, the operation of the transaction processor remains the same, except for the addition of routing information for the BINs of the multifunction cards." *Id.*

At the April 14, 2021 hearing, the parties presented no oral argument and instead rested on their briefing.

(b) Analysis

Claim 32 recites (emphasis added):

> 32. A multifunction card system comprising:
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
> b. a *transaction processor* receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
> c. a processing hub receiving directly or indirectly said card data from said *transaction processor*; and
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

*Datastream* construed "transaction processor" to mean "a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device." *Datastream* at 7. The parties in *Humana* adopted this

construction, as did the parties in *United Health* and *IDT*. *Humana* at 8; *UnitedHealth* at 1; *IDT* at 10.

Defendants assert that Plaintiff has relied on the transaction processor as being a specialized, unconventional component, and Defendants submit that "AlexSam and its expert have even relied on the transaction processor to oppose the ineligibility of the asserted claims." Dkt. No. 59 at 19 (citing Dkt. No. 1, Ex. B, May 1, 2019 Zatkovich Decl. at ¶ 81).

The cited expert declaration, however, relies on the combination of a "processing hub" with a transaction processor. *Id.* ("[T]he combination of a Processing Hub with a transaction processor and the use of a unique identification number is also unconventional."). Indeed, in that same declaration, Plaintiff's expert describes transaction processors as follows: "*Transaction processors* – (aka retailer central processor/ bank processor) servers already utilized by retailers that will now transmit multifunction card transactions from point of sale devices to the processing hub and the banking network." *Id.* at ¶ 47(d) (citing '608 Patent at Cl. 32(b)). In this same declaration, Plaintiff's expert also opines:

> 63. Most POS devices (cash registers, credit card readers, etc.) cannot connect directly to the banking network. The transaction processor provides connectivity between the POS devices and the banking network. The transaction processor also enables communications between the POS devices and the Processing Hub.
>
> * * *
>
> 68. The "transaction processor" acts as a link to route and receive data between the POS device and the Processing Hub or gift certificate/loyalty card computer. The multifunction card system disclosed in the '608 Patent can include many transaction processors, such as MasterCard, Visa, Discover, and/or the retailer. Transaction processors are embodied as components 201, 202, 203, or 209 in Figure 2 or the '608 Patent. '608 Patent, 6:32–34, 6:52–55, 6:34–40 respectively.

*Id.* at ¶¶ 63, 68; *see, e.g.*, '608 Patent at 6:15–16 ("the POS device 105 transmits the data either directly or via the central processor 201 to the bank processor 208").

Further, Defendants submit that "[i]f that is true and the transaction processor is some well-known, conventional component of the claimed system, rather than a novel aspect supporting the eligibility and validity of the asserted claims, then Defendants could agree that the term should be construed consistent with AlexSam's proposal: 'a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard point-of-sale retail device.'" Dkt. No. 59 at 19.

Based on this statement by Defendants (*id.*), and based on Plaintiff's assertion that a "transaction processor" is a well-known, conventional component (*see* Dkt. No. 58 at 21–24), the Court rejects Defendants' indefiniteness argument and adopts Plaintiff's proposed construction. The Court accordingly hereby construes **"transaction processor"** to mean **"a computer, other than a processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard retail point-of-sale device."**

**11. "processing hub"**

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| "a computer which provides front-end POS device management and message processing for card authorizations or activations"; Not Indefinite | Indefinite |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 24; Dkt. No. 59 at 21; Dkt. No. 62, Ex. A at A-5. The parties submit that this term appears in Claim 32. Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A at A-5.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a computer which provides front-end point-of-sale device management and message processing for card authorizations or activations." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that this term is not indefinite because other claim language provides context, such as the recitals that "the Processing Hub interacts with a POS device *via* the transaction processor, further informing the structure of the claimed Processing Hub." Dkt. No. 58 at 25 (citations omitted).

Defendants respond that even though "AlexSam has championed the 'Processing Hub' as the key innovation of the '608 Patent," "the asserted claims again use functional claiming with respect to the processing hub, and they (and the specification) fail to identify what the processing hub actually is." Dkt. No. 59 at 21; *see id.* at 21–23. Defendants argue that "[t]he use of functional claiming at this key point of novelty, upon which AlexSam relies heavily to oppose the ineligibility of the asserted claims, renders the claims indefinite." *Id.* at 21.

Plaintiff replies that "the specification discloses, and a POSITA would understand, how multifunction transactions originate at a POS device that will be routed via the banking network to a Processing Hub." Dkt. No. 60 at 8. Further, Plaintiff argues:

> Defendants also err by construing the term "Processing Hub" divorced from its context within the claim and the scope of the patent. Here, the '608 Patent does not disclose new transactions, e.g. pre-paid card, medical information requests, etc. These were well known in the art. *See e.g.* Dkt. No. 59-2, at 1:36–2:19, 2:52–64. Therefore, it is not the intent of the patentee to teach details of how a pre-paid phone card transaction is processed, or how a medical information card transaction is processed within the Processing Hub. The banking institutions and merchants that already performed these functions knew how to do so. *See In re: Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991) ("The specification need not disclose what is well known in the art").

*Id*. at 9.

At the April 14, 2021 hearing, Defendants emphasized *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) for the proposition that when a patent lacks sufficient clarity regarding an element that is the crux of a claim, then the claim is indefinite.

(b) Analysis

Claim 32 recites (emphasis added):

32. A multifunction card system comprising:

a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

c. a *processing hub* receiving directly or indirectly said card data from said transaction processor; and

d. said *processing hub* accessing a first database when the card functions as a debit card and said *processing hub* accessing a second database when the card functions as a medical card.

Defendants argue that the term "processing hub" suffers from the "vice of functional claiming" by using "conveniently functional language at the exact point of novelty," thereby rendering the claim indefinite. *Halliburton Energy Servs.*, 514 F.3d at 1255 (quoting *General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938)); *see Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353 (Fed. Cir. 2010) (improper to "recite a description of the problem to be solved while claiming all solutions to it").

*Datastream* found that the specification defines the term "processing hub" in the following disclosure:

VI. Processing Hub Technical Details

*The processing hub 103 of the present invention provides front-end POS device management and message processing for card authorization and activations. The processing hub 103 can be implemented using any computer having acceptable processing and storage capacity.* It preferably comprises a Stratus RADIO Cluster™, which is a scaleable system based upon the standard Intel Pentium processor. The Stratus RADIO Cluster™ provides the processing hub 103 with a high degree of reliability and fault-tolerance. Since the Stratus system is scaleable, an adequate degree of redundancy can be provided in order to reduce the impact of individual failures. In addition, as demand for the multifunction card system increases, the processing hub 103 can be scaled to meet increasing demands for

> processing power and storage availability. The modular design of such a hub is upgradable for long term capacity planning and expansion.

’608 Patent at 10:65–11:15; *see Datastream* at 10 (citing and quoting the above-italicized portion of this paragraph).

*Datastream* construed “processing hub” to mean “a computer which provides front-end POS device management and message processing for card authorizations and activations.” *Datastream* at 10. *Humana* noted that Claim 32 was not at issue in *Datastream*, and *Humana* modified the *Datastream* construction, finding that “[b]ecause the Court agrees with Alexsam that Claims 32 and 33 do not involve activation, and these are the only claims asserted in this case, the Court will modify its previous construction to exclude ‘activation’ from its prior construction [of] this term.” *Humana* at 16. *Humana* construed “processing hub” to mean “a computer which provides front-end POS device management and message processing for card authorizations.” *Id.* *UnitedHealth* adopted the *Humana* construction. *UnitedHealth* at 2.

*IDT* discussed *Datastream* and *Humana* and found that “a processing hub could perform activations without performing authorizations.” *IDT* at 17–18. *IDT* construed “processing hub” to mean “a computer which provides front-end point of sale device management and message processing for card authorizations or activations.” *Id.* at 18.

The *IDT* construction was also adopted as agreed-upon in *Best Buy* and in *MasterCard*. *Best Buy* at 13 and 39; *MasterCard* at 6.

Having considered the prior claim construction analysis as well as the intrinsic evidence, the Court finds that the claim language “inform[s] those skilled in the art about the scope of the invention with reasonable certainty.” *Nautilus*, 134 S. Ct. 2129. The opinions of Defendants’ expert to the contrary are unpersuasive. *See* Dkt. No. 59, Ex. 1, Jan. 12, 2021 Dreifus Decl. at ¶ 106 (“The claims do not describe what the processing hub is, how the processing hub is

structured, how it receives data from the transaction processor, how it knows whether the card is being used for one function or another, or how it accesses one of two distinct databases based on how the card is being used."); *see id.* at ¶¶ 105–07, 118–23. For example, Defendants' expert opines that banking communications and medical information communications are highly-regulated fields, but this merely reinforces that persons of ordinary skill in these arts would have a great deal of knowledge concerning the context in which a "processing hub" would operate. *See id.* at ¶¶ 111–17. Finally, although Defendants' arguments regarding sufficiency of disclosure may perhaps bear upon other issues, such as enablement or written description, Defendants' arguments do not demonstrate indefiniteness.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument, and the Court hereby construes **"processing hub"** to mean **"a computer which provides front-end point-of-sale device management and message processing for card authorizations or activations."**

**12. "first database when the card functions as a debit card"**

**13. "second database when the card functions as a medical card"**

| **"first database when the card functions as a debit card"** | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a database, distinct from the second database, containing funds in a card holder's non-medical savings or checking account" |

| **"second database when the card functions as a medical card"** | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a database, distinct from the first database, containing a card holder's medical information/history and medical funds" |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 26; Dkt. No. 59 at 24; Dkt. No. 62, Ex. A at A-5. The parties submit that these terms appear in Claim 32. Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A at A-5.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary constructions:

| Term | Preliminary Construction |
|---|---|
| "first database" | "a database that is distinct from the second database" |
| "second database" | "a database that is distinct from the first database" |

Plaintiff agreed with the Court's preliminary constructions. Defendants opposed.

(a) The Parties' Positions

Plaintiff argues that Defendants' proposals "introduce confusion and uncertainty" and lack support in any definition or disclaimer. Dkt. No. 58 at 26. Instead, Plaintiff argues, "[d]atabases are simply places to store information, which is consistent with the use of these phrases throughout the '608 Patent." *Id.* Plaintiff further argues that "[t]here is no requirement in either the claims or specification that indicate a) that a medical services card must have access to medical information/history or b) that both medical funds and medical history must be accessed through a single database." *Id.* at 27 (citation omitted). Plaintiff submits that a person of ordinary skill in

the art would recognize that "systems managing medical information/history are generally very different and distinct from systems that manage accounting and financial payments." *Id.* at 28 (citation omitted).

Defendants respond that "AlexSam . . . concedes that the 'first' and 'second' databases must indeed be distinct from one another . . . ." Dkt. No. 59 at 26 (citing Dkt. No. 58 at 26). Defendants argue that "[a]s AlexSam acknowledges that the claims require separate 'first' and 'second' databases accessed by, respectively, debit transactions ('first database') in the first instance, and medical services transactions ('second database') in the second instance, medical funds cannot be in both the first and second database." *Id.* As to the "first database," Defendants argue that "the meaning the '608 Patent gives to 'debit cards' is clear: they are common, 'typical' cards providing card holders with 'access to funds from their savings or checking accounts' and 'do not serve a plurality of functions.'" *Id.* at 24 (citing '608 Patent at 1:10–26). As to Defendants' proposal that the "second database" contains medical information and medical funds, Defendants argue that "AlexSam's argument that the plain and ordinary meaning of 'second database' encompasses some other databases (unidentified by either the patent or AlexSam) cannot stand as it would inject improper ambiguity into the scope of the claims." *Id.* at 27.

Plaintiff replies: "[T]he Court should accord these terms their plain and ordinary meaning because the only requirement is that there are two distinct databases where one database is accessed during a debit card transaction and a second database is accessed during a medical services transaction. No content is required, other than by the names of the databases themselves." Dkt. No. 60 at 10.

At the April 14, 2021 hearing, Defendants reiterated that these are distinct and different databases. Plaintiff responded that the patent-in-suit does not preclude a particular database from holding multiple different types of information.

(b) Analysis

Claim 32 recites (emphasis added):

> 32. A multifunction card system comprising:
>
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
>
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
>
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a *first database when the card functions as a debit card* and said processing hub accessing a *second database when the card functions as a medical card*.

As to Defendants' proposal that the databases must be distinct from one another, Plaintiff acknowledges that "there are two distinct databases where one database is accessed during a debit card transaction and a second database is accessed during a medical services transaction." Dkt. No. 58 at 28.

Defendants further propose distinguishing between a database containing "funds in a card holder's non-medical savings or checking account" and a database containing "medical funds."

The specification discloses:

> [T]he multifunction card system 108 of the present invention is capable of providing an information retrieval card. In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided. Each participating patient's medical information is stored in a record in a medical information database 207 maintained at the processing hub 103. The record contains the identification number encoded on the patient's card 101.

> When medical history information data is needed, it may be requested by swiping the card 101 through a POS device 105 at a participating doctor's office or hospital. Preferably, a PIN is entered into the POS device 105 to ensure that only an authorized person is able to request the information. The POS device 105 would then send the request to the processing hub 103 via one of the routes described above. When the processing hub 103 receives the request from the authorized requester, it then immediately sends the information to the requestor via means preselected by the participating doctor's office or hospital. Such means may include electronic mail, facsimile, voice response, and other similar means. The medical history information may be updated by the patient or his or her doctor or insurer by forwarding new information to the operator of the system 108 via an on-line connection, over the Internet, by telephone, by facsimile, or by mail.
>
> * * *
>
> In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system 108 also allows access to a database which maintains the medical funds for the cardholder. As described above under the Electronic Gift Certificate™ section, the system 108 is able to authorize, reject, and cause money to be transferred based upon the cardholder's available medical funds.

'608 Patent at 10:8–47.

Defendants identify no disclosure, however, that precludes a debit card from being used to access an account that holds medical funds. Instead, the specification discloses generically that "the system 108 also allows access to a database which maintains the medical funds for the cardholder." *Id.* at 10:42–44. Defendants do not demonstrate that medical funds and medical history, for example, need to be accessed through a single database.

As to the proper constructions, Plaintiff argues that "[n]o content is required, other than by the names of the databases themselves." Dkt. No. 60 at 10. Plaintiff thus essentially argues that the "first database" and "second database" could be any two databases that are distinct from one another. Dkt. No. 58 at 28–29. Plaintiff therefore proposes "plain and ordinary meaning" for both of the disputed terms here at issue. *Id.* at 28.

Although Plaintiff's proposal that the recited databases need only be distinct from one another appears, at first blush, to fail to give meaning to the disputed terms, neither the disputed terms nor surrounding claim language limit the nature of these databases. Instead, these databases are recited generically as a "first" database and a "second" database. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) ("The use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation."); *cf. Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) ("In this case, the claims include two arms, and the claims' use of the terms 'first pivot point' and 'second pivot point' distinguishes the pivot point on the 'first extension arm' from the pivot point on the 'second extension arm.' 'First' does not denote spatial location, that is, it does not suggest where on the 'first extension arm' or the 'second extension arm' the pivot points are located. The correct construction of the word 'first' merely associates the first pivot point with the first extension arm . . . .").

Defendants' proposals, which would limit these disputed terms to specific features of particular disclosed embodiments, are therefore rejected. *See Phillips*, 415 F.3d at 1323. Finally, the Court construes only the terms "first database" and "second database" because the present dispute is focused on the nature of the databases rather than on "when the card functions as a debit card" or "when the card functions as a medical card."

The terms "first database" and "second database" should therefore be construed as distinct from one another. Admittedly, defining "first database" and "second database" with reference to one another is circular, and circularity in claim constructions is generally disfavored. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1086, 1090 (Fed. Cir. 2003) (rejecting construction of the term "Internet *address*" as meaning "a particular host on the Internet, specified by a *uniform*

*resource locator* that is unique to that host" because the district court construed "*uniform resource locator*" to mean "the complete *address* of a site on the Internet specifying both a protocol type and a resource location") (emphasis added). This is appropriate in the present case, however, to give effect to the distinction between the "first database" and the "second database." *See 3M*, 350 F.3d at 1371 (quoted above); *cf. Free Motion*, 423 F.3d at 1348 (quoted above).

At the April 14, 2021 hearing, the parties agreed that these databases must be distinct from one another, but Plaintiff expressed some uncertainty regarding the meaning of "distinct" in the context of databases. Based on the intrinsic evidence now before the Court, however, any dispute regarding "distinct" relates to factual issues of infringement rather than any legal question for claim construction. *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

The Court therefore hereby construes "first database" and "second database" as set forth in the following chart:

| Term | Construction |
| --- | --- |
| **"first database"** | **"a database that is distinct from the second database"** |
| **"second database"** | **"a database that is distinct from the first database"** |

**14. "medical identification number"**

| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| "a number used for identification purposes associated with a record in a database containing medical information" | "a number used for identification purposes that is associated with a record in a database containing a card holder's medical information/history and medical funds" |

Dkt. No. 46, Ex. A at 3; Dkt. No. 58 at 29; Dkt. No. 59 at 27; Dkt. No. 62, Ex. A at A-6. The parties submit that this term appears in Claim 33. Dkt. No. 46, Ex. A at 3; Dkt. No. 62, Ex. A at A-6.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a number used for identification purposes associated with a record in a database containing medical information." Plaintiff agreed with the Court's preliminary construction. Defendants opposed.

(a) The Parties' Positions

Plaintiff submits that its proposal is consistent with the Court's analysis in *Humana*. Dkt. No. 58 at 29.

Defendants respond that "[t]he parties' respective positions on this term largely mirror their disputes concerning 'Medical Card'/'Medical Services Card' and the 'Second Database When the Card Functions as a Medical Card.'" Dkt. No. 59 at 28. Defendants argue that whereas the parties "agree that the term is a number used for identification purposes associated with a record in a database containing medical information," Plaintiff "attempt[s] to omit the fact that it is a cardholder's medical information and that the information includes the cardholder's medical history and medical funds." *Id.* Defendants "respectfully submit that the *Humana* construction was founded upon a mistaken reliance upon different claims using a 'single identification number,'

not a 'medical identification number.'" *Id.* That is, Defendants argue that Claim 13, cited by *Humana* in its analysis, is not analogous to Claim 33, which is the claim here at issue. *Id.*

Plaintiff replies that "[t]here is simply nothing in the language of the claims, or the remainder of the specification, that requires the *medical* identification number to be used to access either 'medical history' or 'medical funds.'" Dkt. No. 60 at 5.

At the April 14, 2021 hearing, the parties presented no oral argument and instead rested on their briefing.

<u>(b) Analysis</u>

Claims 32 and 33 recite (emphasis added):

> 32. A multifunction card system comprising:
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
> d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.
>
> 33. The multifunction card system of claim 32, wherein the unique identification number further comprises a *medical identification number*.

*Humana* analyzed this term as follows:

> On this term, the parties disagree as to what a medical database record entails. Because Humana seeks to limit the database to one containing only medical history information, it argues that the record being retrieved using a "medical identification number" has to be a patient's record containing medical history information. . . . Humana argues that [the] phrase "medical-related data" as proposed by Alexsam is too broad.
>
> The specification does not recite the term "medical identification number." The only related disclosure is of an "identification number encoded on the patient's card" that is used to pull a record containing a patient's medical information stored

> in a medical information database. *See* '608 patent, 10:7–12. The Court has, however, construed the term "medical card" to include databases that contain "medical information." Furthermore, the claims allow for the use of single identification number that can be used to access different types of databases. *See, e.g.*, '608 patent, cl. 13. Therefore, it is inappropriate to limit the scope of this term to patient medical history information alone.

*Humana* at 12.

*Humana* then construed "medical identification number" to mean "a number used for identification purposes associated with a record in a database containing medical information" (*id.*), and this is the construction that Plaintiff proposes in the present case.

Defendants note that *Humana* cited Claim 13, which recites "a single identification number," but *Humana* did construe "medical identification number" so as to refer to medical information. That is, *Humana* cited Claim 13 merely as further support that "the claims allow for the use of [a] single identification number that can be used to access different types of databases." *Id.* *Humana* concluded that "it is inappropriate to limit the scope of this term to patient medical *history* information alone." *See id.* (emphasis added). Also, as discussed above regarding the term "medical card," *Humana* rejected a proposal to require access to medical *history*. *See Humana* at 10–12.

As to Defendants' proposal of referring to "medical funds," the specification discloses that "the system 108 also allows access to a database which maintains the medical funds for the cardholder." *Id.* at 10:42–44. Particularly in light of this generic reference to "a database" (*id.*), Defendants do not show that these medical funds must be contained within a database record associated with a medical identification number. Finally, Defendants do not adequately justify their proposal that the medical information associated with a particular medical identification number must necessarily be of a "card holder."

The Court therefore hereby construes **"medical identification number"** to mean **"a number used for identification purposes associated with a record in a database containing medical information."**

**15. "unmodified existing standard point-of-sale device"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a terminal for making purchases of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system" | "a terminal for making purchases of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system"<br><br>The phrase "of the type in use as of July 10, 1997" modifies the word "terminal," not "purchases." |

Dkt. No. 46, Ex. A at 4; Dkt. No. 58 at 30; Dkt. No. 59 at 29; Dkt. No. 62, Ex. A at A-4. The parties submit that this term appears in Claim 32. Dkt. No. 62, Ex. A at A-4.

Shortly before the start of the April 14, 2021 hearing, the Court provided the parties with the following preliminary construction: "a terminal, for making purchases, that is of the type in use as of July 10, 1997, and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system." Both sides agreed to the Court's preliminary construction.

The Court therefore hereby construes **"unmodified existing standard point-of-sale device"** to mean **"a terminal, for making purchases, that is of the type in use as of July 10, 1997, and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system."**

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 20th day of April, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that on this date, on behalf of Plaintiff-Appellant ALEXSAM, INC., I caused to be filed with the Clerk of the United States Court of Appeals for the Federal Circuit *via* the Court's CM/ECF system, which caused it to be served on all counsel of record, a copy of the ALEXSAM, INC.'S CORRECTED OPENING APPELLATE BRIEF.

Dated: October 31, 2022

Respectfully submitted,

*/s/ Jacqueline K. Burt*

Jacqueline K. Burt
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Ste. 4320
Atlanta, Georgia 30339
Email: jburt@hgdlawfirm.com
Telephone: (404) 996-0861
*Attorney for Plaintiff-Appellant, AlexSam, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(g) and 28.1(e)(3) of the Federal Rules of Appellate Procedure ("Fed. R. App. P.") and Rules 32(b)(3) and 28.1(c) of the Federal Circuit Rules ("Fed. Cir. R."), AlexSam certifies:

1. This document complies with the type-volume limitation because it contains 11,762 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).
2. This document complies with the typeface requirements of because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO in Times New Roman 14 point font.
3. This document complies with the limitations set forth in Fed. Cir. R. 28(d) because it contains 1029 words (including numbers) marked as confidential.

Dated: October 31, 2022 Respectfully submitted,

*/s/ Jacqueline K. Burt*
Jacqueline K. Burt
*Attorney for Plaintiff-Appellant, AlexSam, Inc.*